## *STATE v. JONES.

Decision in *State* v. *Pike*, 49 N. H. 399, holding indictment sufficient to sustain a verdict of murder in the first degree, reäffirmed. (DOE, J., and SMITH, J., dissenting.)

This court will not reverse the decision of the court at the trial term upon the competency of a juror, unless it appear that such decision was clearly against law and evidence.

On trial of defendant for the murder of his wife, the defence was insanity. Evidence was introduced tending to show that he believed his wife guilty of adultery with one F., and that he killed her for that reason; also, that during the trial defendant had said his belief in his wife's infidelity was founded not only on public rumor, but also on his own observation; and it was claimed for him that this belief was an insane delusion. *Held*, that evidence tending to show the existence of such a common rumor in the village where defendant and his wife lived, was properly received.

*Held*, that, as bearing upon the question of sanity, the State was properly allowed to prove, to a large extent, the history of defendant, including his treatment of his wife and children, his health, intemperance, impulsive temperament, excitable nature, quarrels, wrangling, making preparations and threats to shoot a neighbor, and violent conduct at various times during a period of many years before the death of his wife.

At the trial, the court charged the jury that if the defendant killed his wife in a manner that would be criminal and unlawful if the defendant were sane, the verdict should be " not guilty by reason of insanity," if the killing was the offspring or product of mental disease in the defendant.

---

* This opinion was delivered June term, 1871. I have, in consequence of its importance, inserted it here, a circuit in advance of its proper place, for the convenience of the profession.                                    REPORTER.

Neither delusion, nor knowledge of right and wrong, nor design or
cunning in planning and executing the killing and escaping or avoiding
detection, nor ability to recognize acquaintances, or to labor, or transact
business, or manage affairs, is, as a matter of law, a test of mental disease ;
but all symptoms and all tests of mental disease are purely matters of
fact, to be determined by the jury. Whether the defendant had a
mental disease, and whether the killing of his wife was the product of
such disease, are questions of fact for the jury.

Insanity is mental disease—disease of the mind. An act produced by
mental disease is not a crime. If the defendant had a mental disease
which irresistibly impelled him to kill his wife—if the killing was the
product of mental disease in him—he is not guilty. Insanity is not in-
nocence unless it produced the killing of his wife.

If the defendant had an insane impulse to kill his wife, and could have
successfully resisted it, he was responsible. Whether every insane im-
pulse is always irresistible, is a question of fact. Whether in this case
the defendant had an insane impulse to kill his wife, and whether he
could resist it, are questions of fact.

Whether an act may be produced by partial insanity when no connection
can be discovered between the act and the disease, is a question of fact.

*Held*, that these instructions were correct.

Where insanity is set up as a defence to an indictment, the jury must be
satisfied beyond a reasonable doubt that the killing was not produced by
mental disease.

INDICTMENT against Hiram Jones for the murder of his wife. The
defendant was found guilty of murder in the first degree, upon the
following indictment:

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;

" That Hiram Jones, of Newmarket in the county of Rockingham
aforesaid, yeoman, on the fourth day of June, in the year of our Lord one
thousand eight hundred and seventy, at Newmarket in the county of
Rockingham aforesaid, with force and arms, in and upon one Ann
Jones, feloniously, wilfully, and of his malice aforethought, did make
an assault ; and that the said Hiram Jones, with a certain razor, the
throat of the said Ann Jones feloniously, wilfully, and of his malice
aforethought, did strike and cut ; and that the said Hiram Jones, with
the razor aforesaid, by the striking and cutting aforesaid, did then and
there give to the said Ann Jones, in and upon the said throat of the
said Ann Jones, one mortal wound of the length of three inches and of
the depth of two inches,—of which said mortal wound the said Ann
Jones then and there instantly died.

" And so the jurors aforesaid, upon their oath aforesaid, do say that
the said Hiram Jones the said Ann Jones, in the manner and by the
means aforesaid, feloniously, wilfully, and of his malice aforethought,
did kill and murder, contrary" &c.

The following questions were put to the jurors drawn to try the case:

I. Have you formed an opinion as to what the verdict ought to be in this case?

II. Have you any conscientious scruples against the punishment of death for murder in the first degree?

When the second question was answered in the affirmative, the following question was put:

III. Would your scruples prevent your agreeing to a verdict according to the evidence, if the defendant should be clearly proved guilty of murder in the first degree?

Goodrich, one of the jurors, replied to the second question, "I think I have;" and to the third question, "I don't know as they would." Being further questioned on this point, he manifested a great unwillingness to act as juror in this case, on account of said scruples. Upon his answers and his manner of giving them, the court found, as matter of fact, that he would weigh the evidence under a conscientious bias against capital punishment, and that, for this reason, he would not be an impartial or indifferent juror; and, on that ground he was excused; and the defendant excepted.

Rollins, another juror, was excused because of his conscientious scruples against capital punishment; and the defendant excepted on the ground that the indictment was not of murder in the first degree, the murder not being alleged to have been committed in any of the particular methods described in Gen. St., ch. 264, sec. 1.

The defence was insanity. The defendant killed his wife June 4, 1870. One Page, a police officer, was called to defendant's house May 22, 1870, on account of some violent demonstrations of the defendant, which had subsided when Page arrived at the house. Page was a witness for the State, and testified that at that time he had a conversation with defendant's wife, not in defendant's presence. On cross-examination of Page, defendant's counsel proposed this question: "What did Mrs. Jones then say to you about being left by you alone with the defendant, and what did she say about being afraid of him, or afraid to be left alone with him?" The question was excluded, and defendant excepted. The defendant claimed that the State had put in a part of said conversation, but the court had no recollection or minute of it.

One Bennett, a witness called by the defendant, testified that he had employed defendant in a scow of which one Drew was master, on the river between Newmarket and Portsmouth, and that he discharged defendant from that employment upon a statement made by Drew not in defendant's presence. Defendant offered to prove, by Bennett, that statement in relation to defendant and his mental condition. The court excluded the evidence, and defendant excepted.

Defendant excepted to a ruling of the court excluding the remarks made to Bennett, during the same time, not in defendant's presence, by other persons calling his attention to defendant's mental condition.

Said Drew testified to conduct of defendant in the scow. Defendant

proposed this question: " In consequence of what took place on the boat, did you say anything to Mr. Bennett?" The court excluded the question, and defendant excepted.

There was evidence tending to show that defendant believed his wife guilty of adultery with one French, and that he killed her for that reason. Defendant's counsel claimed that this belief was an insane delusion.

There was evidence tending to show that, during the trial, the defendant had said his belief in his wife's infidelity was founded not only on public rumor, but also on his own observation. Subject to defendant's exception, the State was allowed to prove that from May 22 to June 4, 1870, there was, in the village of Newmarket, where defendant and his wife lived, a common rumor of a criminal intimacy between defendant's wife and said French:

Subject to defendant's exception, the State was allowed to prove, to a large extent, the history of defendant, including his treatment of his wife and children, his health, intemperance, impulsive temperament, excitable nature, quarrels, wrangling, making preparations and threats to shoot a neighbor, and violent conduct at various times during a period of many years before the death of his wife. The court instructed the jury, in accordance with defendant's request, that this evidence could be considered only as bearing on the question of sanity.

The defendant excepted to the several refusals of the court to give the jury each of the following instructions: ·

1. Under this indictment the defendant cannot be convicted of murder in the first degree.

2. If the defendant was diseased in mind to any extent whatever, and the mental disease under which he labored had any influence whatever in leading him to kill his wife, he was not responsible.

3. Any degree of insanity or delusion, and especially such insanity or delusion as would render the defendant incompetent to make a will, makes him also incapable of crime and not responsible, though the jury may be unable to trace any connection between the partial insanity and the act complained of.

4. Delusion is the legal test of insanity.

5. If the defendant was under the influence of any insane delusion whatever, or any insane delusion connected with the killing of his wife, he was not responsible.

6. Knowledge of right and wrong, in respect to the act in question, is the legal test of insanity.

7. If the defendant killed his wife under the control of an irresistible impulse, he is not legally responsible.

The defendant excepted to the following instructions given to the jury:

If the defendant killed his wife in a manner that would be criminal and unlawful if the defendant were sane, the verdict should be " not guilty by reason of insanity," if the killing was the offspring or product of mental disease in the defendant.

Neither delusion, nor knowledge of right and wrong, nor design or cunning in planning and executing the killing and escaping or avoiding detection, nor ability to recognize acquaintances, or to labor, or transact business, or manage affairs, is, as a matter of law, a test of mental disease; but all symptoms and all tests of mental disease are purely matters of fact, to be determined by the jury. Whether the defendant had a mental disease, and whether the killing of his wife was the product of such disease, are questions of fact for the jury.

Insanity is mental disease—disease of the mind. An act produced by mental disease is not a crime. If the defendant had a mental disease which irresistibly impelled him to kill his wife—if the killing was the product of mental disease in him—he is not guilty; he is innocent—as innocent as if the act had been produced by involuntary intoxication, or by another person using his hand against his utmost resistance. Insanity is not innocence unless it produced the killing of his wife.

If the defendant had an insane impulse to kill his wife, and could have successfully resisted it, he was responsible. Whether every insane impulse is always irresistible, is a question of fact. Whether in this case the defendant had an insane impulse to kill his wife, and whether he could resist it, are questions of fact.

Whether an act may be produced by partial insanity when no connection can be discovered between the act and the disease, is a question of fact.

The defendant is to be acquitted on the ground of insanity, unless the jury are satisfied beyond a reasonable doubt that the killing was not produced by mental disease.

The defendant was sentenced, and filed this bill of exceptions.

*Hatch,* and *Wiggin,* for defendant.

I. The answers of Goodrich did not justify the finding of the court that he would not be an impartial juror.

II. The indictment is for murder generally, and under it the defendant ought not to have been tried or convicted of murder in the first degree.

The counsel of defendant are aware that this question was considered in *Pike's* case, but not precisely in the form in which it is now raised. It is understood that the court was not unanimous in that case; and the gravity of the occasion seems to justify our request that the question be further considered.

The constitution, Bill of Rights, art. 15, entitles the defendant to have his offence "fully, plainly, substantially, and formally described to him;" and all the common law rules of criminal pleading corroborate this right. Now there is nothing in this indictment to intimate to defendant that he was to be tried for murder in the first degree. The statute, ch. 264, sec. 1, uses certain terms to describe this crime, which are words of art, as essential to the description of the offence as are the words "feloniously," "wilfully," and "of his malice afore-

thought," to charge murder under the Act of January 2, 1829. (Laws of 1830, p. 148.) More so, because none of these words, except "wilfully," is used in that statute.

III. The testimony of Page is not fully stated in the case. He went to defendant's house in consequence of some violent demonstrations of defendant, during which the defendant manifested an intention to kill himself. After conversation in the presence of defendant, which Page recited in evidence, Page and the wife of defendant stepped outside the door, into the entry, and held further conversation, the recital of which the court excluded. We claim that this evidence was admissible, and that it tended directly to show (1) the condition of the prisoner, and (2) the relations between him and his wife; and that for the latter purpose it was admissible, without regard to the previous conversation. (We ask that the case may be amended to show the above facts.) It tends also to contradict and modify the evidence in relation to the former conduct of the defendant, which was introduced by the State's counsel. Case, p. 371.

IV. In most of the courts of the Union and in England, the opinions of witnesses (not experts) as to the sanity of a party, are admitted. *Boardman* v. *Woodman*, 47 N. H. 144. In a capital case, we have no hesitation in asking the court to reconsider the rule by which this testimony was excluded, though it has been very recently affirmed. Practically it is almost impossible for witnesses to detail the facts and describe the symptoms which upon their own minds have left the most vivid impression of the existence of insanity, as a fact. That experts cannot do this, was abundantly demonstrated at the trial of this defendant. A cross-examination of an hour failed to extort, from the learned principal of an insane asylum, the admission that there is any test of insanity, or any symptom or fact, from which its existence can be inferred. Yet the defendant was convicted upon the testimony of experts who had never seen him till long after the killing, and whose opportunities for personal observation were of the very briefest kind. We insist that the opinions of the persons who were with the defendant and about him during all the gloomy and terrible affliction of the few weeks preceding the death of his wife, must be infinitely more accurate and more satisfactory than those of the persons whom the ruling of the court admitted as experts.

The distinction between a layman and an expert in cases like this is by no means clear. All men have more or less observation of insanity, and the rule or fact of sanity is the common daily experience of everybody. Though not easily definable, the fact of insanity is as perceptible to everybody as an inequality in the level of the earth. That physicians and keepers of lunatic asylums know very little more than the fact apparent to common observation is plain, from the consideration that the law of insanity, following their learned guidance, has been and is uncertain, changeable, unreliable, and unsatisfactory. The testimony of the experts in this trial settled the fact that the doctors have no exclusive or scientific knowledge of the subject, more conclusively than it tended to settle anything else.

Upon kindred subjects, the opinions or conclusions of ordinary witnesses are habitually admitted : as to drunkenness, which is itself but a temporary insanity : as to the existence of certain diseases, 34 N. H. 428 ; certain natural phenomena, as length, time, anger, identity, hand-writing, age, and the like.

The present case is distinguishable from *Boardman* v. *Woodman*, *State* v. *Pike*, etc., in this, that we offered to prove as a fact, the impression made upon the minds of the witnesses by the appearance and conduct of the defendant at times anterior to the act for which he was indicted.  The conduct of the defendant at those times was unquestionably evidence to be considered by the jury.  But from the nature of the case, no description of that conduct can fairly set forth the facts which made the impression on the minds of the witnesses ; it can be communicated to the jury only by narrating the impression *made at the time* upon the mind of the witness.  Such testimony comes within the " necessity " so well described in *Whittier* v. *Franklin*, 46 N. H. 25.

V. The evidence relating to the conduct of the defendant many years before the death of his wife, and in regard to other persons, had no bearing on the question of his sanity at the time of her death, and it tended strongly to create a prejudice against him in the minds of the jury.

VI. The defendant was entitled to the instructions to the jury asked for at the trial ; and those given were erroneous, particularly because

1. Delusion is the legal test of insanity.  *Boardman* v. *Woodman*, 47 N. H. 139.  And upon this idea the trial was conducted, and other rulings of the court made.  Case, p. 372.

2. In relation to the charge that the mental disease which would excuse defendant's act must have " irresistibly impelled him to kill his wife."

The true rule seems to be, that defendant should be considered not guilty, if insanity *contributed* to the crime.  To speak of insanity as controllable, is really to deny its existence.  If insanity contributed to the crime, then the defendant did not voluntarily do the act in the same sense as if he had been sane.  Just in proportion to the extent of the insanity the guilt of defendant diminishes ; and no man can fix the point where the insanity becomes " uncontrollable."  The law creates no partial crime, but mercifully excuses him whose disease really affects the exercise of his reason, his moral faculties, or his will.  To this extent we think Lord ERSKINE went in *Hadfield's* case ; and such is a fair conclusion from the writers who have followed him.

In the present instance, the private declaration of the jurors was that they found the prisoner insane ; but not enough so to excuse him.

3. Common and universal observation shows that none of the actions of a man who is " partially insane " can be relied upon.  Partial and apparently harmless monomaniacs often suddenly develop frightful homicidal propensities, and relapse again into their apparently harmless madness.  No practical test of the extent of a mental malady has ever been or can be applied ; and the humane spirit of our

law seems to call for a merciful construction of all acts of those who may be described by the single word *insane.*

*The Attorney - General,* for the State.

I. The question in regard to the indictment was settled in *State* v. *Pike,* 49 N. H. 399. That decision is sustained by 1 Whar. Cr. Law, § 1,115; Whar. on Homicide 387; 1 Arch. Cr. Pl. & Pr. 882, 7th ed; Whar. on Homicide 354, 360.

II. The testimony of Page is correctly reported, and the exception taken at the trial exactly stated. It is not contended that that ruling was improper.

III. The opinions of witnesses not experts are inadmissible upon the question of insanity. This was settled in *Boardman* v. *Woodman,* 47 N. H. 120. That judgment was in accordance with a long and uniform practice in this State.

IV. The history of the individual, as bearing upon the question of insanity, is proper evidence. *Mudway* v. *Croft, infra.* Whar. & Stillé's Med. Juris., § 113.

V. *Insanity.* It is objected that the instructions of the court were not in accordance with the law as held in *Boardman* v. *Woodman, supra.*

(1.) That was a civil case; and the judge who gave the opinion seems to make a distinction between civil and criminal cases, referring to Redfield on Wills 72, who says: " We have no occasion to go much into detail upon that species of monomania which, by some writers, is denominated instinctive mania, and by others moral monomania, as it chiefly affects the moral sense. The consideration of this form of insanity is important, chiefly, in the administration of criminal jurisprudence." Ch. Justice PERLEY, who soon after presided at the trial of *State* v. *Pike,* evidently recognized the same distinction, for he gave the same instructions as were given in this case. In *State* v. *Wier,* Grafton co., 1864, BELL, C. J., charged : " The evidence must satisfy the jury that the party at the time of committing the act in question was insane, and that the disease is of such severity that the person is incapable of distinguishing between right and wrong in that particular case, or of controlling the sudden impulses of his own disordered mind; or, as the same rule has been laid down by an eminent judge, a person, in order to be punishable by law, must have sufficient memory, intelligence, reason, and will, to enable him to distinguish between right and wrong in regard to the particular act about to be done, to know and understand that it will be wrong, and that he will deserve punishment by committing it; *to which I add, sufficient mental power to control the sudden impulses of his own disordered mind.*"
* * * * " Delusion,—that is, insane delusion, as defined by Dr. Tyler from Dr. Ray's writings,—is the belief of something either impossible in the nature of things, or impossible under the circumstances. Such delusion, produced by a man's disease, is called insane delusion ; it is, as expressed by a witness, essentially insanity, and it has been

held by some writers to be the great test of insanity. That its exist-
ence proves insanity, I suppose to be clear : perhaps (and that I judge
most probable) there may be the same diseased state, unaccompanied
by any such delusion, as I may hereafter suggest." *    *    *    *    *

" I have been accustomed to regard as the *distinguishing test* of in-
sanity *the inability to control the actions of a man's mind.* Well men
can take up a subject and lay it aside as they please ; can take up and
change the object of thought as they choose. I have been led to think
this is otherwise with the insane, by which I mean active insanity.
One subject, or perhaps a few subjects, engross the whole thoughts,
force themselves on the attention : if driven away by business, they re-
cur when the mind is not occupied ; if painful, the party may try to re-
sist them,—to fly from them to business, to amusement, to drinking,
even ; but they steadily pursue and may override his judgment, his will,
and also his natural affection, may change love to hate and confidence
to suspicion, and this equally when the prevailing idea is false, a
mere delusion, or is true in fact, but magnified beyond all just propor-
tions by the mental disease. The power of the control of the thoughts
being lost, the power of the will over the conduct may be equally lost,
and the party under the influence of disease acts not as a rational be-
ing, but under the blind influence of evil thoughts which he can neith-
er regulate nor control. It was perhaps not without reason, that in
ancient times the insane were spoken of as possessed with an evil
spirit, or possessed with a devil, so foreign are the impulses of that
evil spirit to all the natural promptings of the sane heart and mind."

I think Ch. J. BELL understood the subject of insanity, at that time,
better than any one in our profession in the State, his attention having
been called to it by the fact that he was brother of Dr. Bell, for a long
time the eminent superintendent of the McLean Asylum.

Chief Justice RICHARDSON, in *State* v. *Prescott*, Merrimack co., 1834,
laid down no rule of law as to what constitutes insanity, but submitted
the whole matter as a question for the jury.

In *State* v. *Corey*, Cheshire co., 1830, reported by Joel Parker, the
same distinguished judge submitted the case to the jury in the same
way, saying, " they were the judges of both the law and the fact, and
must exercise their own judgment in the case." Page 76.

If it be suggested that our courts at that time regarded the juries as
judges of both the law and fact in all criminal cases, it is replied, that
it proves also that they did not undertake to lay down any rule of law
upon the subject of insanity.

(2.) The mode of examining medical experts in criminal trials,
when the defence is insanity, is in accordance with the instructions in
this case, and not according to the rule in *Boardman* v. *Woodman.*
They are never asked their opinion of the sanity of the respondent,
*delusion being the test ;* but their judgment is always based upon their
knowledge and experience. Whar. & Stillé's Med. Juris., §§ 93, 94.

It is apparent that the answer may depend upon the stand-point. It
would not be consistent with an intelligent trial of this class of cases
to compel the expert to ignore all the knowledge of the present day.

and to cramp his judgment by a question founded upon the ignorance of the past. As well might the court narrow the questions to experts in mechanics, chemistry, telegraphy, and the arts, down to the knowledge of those subjects as it existed half a century ago. Courts do not mean to say that all the learning upon the subject of insanity is in law books and upon the bench, and that the French, German, English, and American treatises, founded upon the largest experience of the most eminent men in the medical profession, go for nothing.

(3.) There is no uniform and well established legal test of insanity, I respectfully submit. " The symptoms of insanity are quite incapable of description or classification." Redfield on Wills 67.

· Mr. Bennett, after a careful and clear examination of the leading cases on this subject, comes to the conclusion " that it is impossible to give a complete definition of insanity, or one that is universally applicable, or to say what it is and what it is not; it may be described and explained, but not defined."

· We think, however, that the state of the authorities will justify these three propositions as already established:

First. A person is not criminally responsible, if, at the time he committed the act, he had not sufficient capacity to know whether his act was right or wrong, or, more accurately, to know that it was contrary to the law of the land.

Thus far all the authorities agree.

Second. He is not responsible, if the act was done under a fixed *bona fide* delusion that certain facts existed, which were wholly imaginary, but which, if true, would have been a good defence. Fourth answer of the judges in McNaughten's case. *Commonwealth* v. *Rogers; Rex* v. *Offord,* 5 Carrington & Payne 168; *People* v. *Pine,* 2 Barbour 571; *Hadfield's* case; *Martin's* case.

Third. He is not responsible if the act was done under some irresistible impulse, the result of a diseased and disordered mind, which overpowered his will, taking away his power of control, and there was no criminal intent. *Roberts* v. *The State,* Georgia 310; *Regina* v. *Fouchett; Regina* v. *Brixey; Regina* v. *McNaughten; Regina* v. *Oxford; Kleim's* case; 1 Leading Criminal Cases 87."

Sir HERBERT JENNER FUST, in 1843, in a case of considerable obscurity, says: " Now it has frequently been attempted to furnish some general rules which might serve as guides to courts of law in the investigation and decision of cases of this description; but all endeavors to do so have failed: every case has some distinguishing feature: each case must be governed by its own peculiar circumstances. There is one well known case on this subject, in this court, which occurred in the time of my learned predecessor. I allude to the case of *Dew* v. *Clarke.* The most elaborate arguments on this subject were there adduced, and the question most thoroughly considered by the court;— the result was, as I understand it, this: that in all such cases it is absolutely and essentially necessary to look to the peculiar circumstances of each individual case; and to judge from the whole character of the person, whose mental capacity is the subject of inquiry, what

was the state and condition of the mind of that individual, not only with respect to the immediate time at which a will was executed, but at the intermediate stages of his life."

"It is impossible, as I have said, for courts of law to lay down any general rules; but in the investigation of such cases, much assistance will often be derived from the observations and recorded experience of medical men, who have devoted much time and attention to this malady and its attendant symptoms; and I think I cannot, in the present instance, do better than refer to some very sensible remarks, which will be found comprised in a small compass, in a Treatise on Medical Jurisprudence by Dr. Ray." *Mudway* v. *Croft*, 7 Eng. Eccles. Reports 547, by Curteis.

"Jurists who have been so anxious to obtain some definition of insanity, which shall furnish a rule for the determination of responsibility, should understand that such a wish is chimerical from the very nature of things. Insanity is a disease; and, as is the case with all other diseases, the fact of its existence is never established by a single diagnostic symptom, but by the whole body of symptoms, no particular one of which is present in every case. To distinguish the manifestations of health from those of disease, requires the exercise of special learning and judgment; and, if no one doubts this proposition when stated in reference to the bowels, the lungs, the heart, the liver, the kidneys, etc., what sufficient or even plausible reason is there why it should be doubted when predicated of the brain? The functions of those organs proceed with the regularity and sameness of clock-work, compared with the ever-varying and unequal phenomena of this." Ray's Med. Juris. of Insanity, p. 39, § 24.

"Enough has been said, it is believed, to convince every unprejudiced reader that in Great Britain, the law is still loose, vacillating, and greatly behind the present state of our knowledge of that disease. If we carefully examine the cases tried within the last hundred years, as they are brought together in the various treatises on lunacy and criminal law, the utmost respect for authority will not prevent us from observing the want of any definite principles as the ground of the difference of their results." Same, p. 41, § 26.

In *State* v. *Felter*, 25 Iowa 67, as reported in American Law Review, January, 1870, page 372, DILLON, C. J., in delivering the opinion, says: "Perhaps the profession of law has not fully kept pace with that of medicine on the subject of insanity.  *  *  *  *  *  *  *
 .*  *  *  *   The jury, in substance, should be told, that if defendant's act in taking the life of his wife was caused by mental disease or unsoundness, which dethroned his reason and judgment with respect to that act, which destroyed his power rationally to comprehend the nature and consequence of that act, and which, overpowering his will, forced him to its commission, then he is not amenable to legal punishment. But if the jury believe, from all the evidences and circumstances, that the defendant was in possession of a rational intellect or sound mind, and allowed his passions to escape control, then, though passion may for the time have driven reason from her seat and usurped

it, and have urged the defendant, with a force at the moment irresistible, to desperate acts, he cannot claim for such acts the protection of insanity."

In *Stevens* v. *State of Indiana*, in the supreme court of that State, GREGORY, J., delivering the opinion, says: " The great difficulty has been, in cases of partial insanity, to fix the standard of responsibility. The leading case in this country is *Commonwealth* v. *Rogers*, 7 Metcalf 500." After quoting from it, he says : " The charge is by no means clear, and we think it is not entitled to the weight usually awarded to it."

The law was much better put in *Commonwealth ex. rel. Hastings* v. *Haskell*, Philadelphia Legal Intelligencer for Dec. 4, 1868, thus : " That the true test lies in the word power. Has the defendant in a criminal case the power to distinguish right from wrong, and the power to adhere to the right and avoid the wrong ? Has the defendant, in addition to the capacities mentioned, the power to govern his mind, his body, and his estate ?"

Indeed, there are very strong reasons for holding that the charge of Chief Justice PERLEY, in *State* v. *Pike* (see American Law Review for January, 1870, pp. 245, 246), is the true law on the subject. He instructed the jury " that the verdict should be ' not guilty by reason of insanity,' if the killing was the offspring or product of mental disease in the defendant ; that neither delusion, nor knowledge of right and wrong, nor cunning in planning and executing the killing and escaping or avoiding detection, nor ability to recognize acquaintances, or to labor, or to transact business, or to manage affairs, is, as a matter of law, a test of mental disease ; but that all symptoms and all tests of mental disease · are purely matters of fact, to be determined by the jury." The argument that leads strongly to this conclusion is to be found in the able dissenting opinion of Judge DOE, in *Boardman* v. *Woodman*, 47 N. H. 120. " It is not necessary for us to go this length in the present case." See Mr. Bennett's notes to that case.

The American Law Review, before referred to, in an article on " The Law of Insanity," fully endorses the charge of Chief Justice PERLEY and the opinion of Judge DOE. It concludes thus : " The cases, to which we have called the reader's attention, show both the prevailing dissatisfaction with the law of insanity as usually expounded, and the progress that has been making, during the last thirty years, towards that triumphant solution of doubts and difficulties, which we have had the pleasure to record. The friends of humanity may now rejoice in the well grounded faith that the day is not far distant when we shall cease to take the lives of the insane on the strength of a metaphysical subtlety."

(4.) The ruling in this case is safe to the public and humane to the criminal.

It is the duty of the State to protect its innocent citizens, even though they may be charged with crime, and especially if they are unfortunately insane ; and it cannot add to the security of the public to punish either of these classes. I do not think we are called upon, at this day, to endorse in full the sentiment of Sir William Blackstone,

that it is better that ten guilty persons should escape, than that one
innocent suffer.   Then, in England, no less than one hundred and
sixty offences were punishable by death ; now, in this State, only one,
and that subject to many limitations and conditions.   But if courts in
this country feel bound to hold to the most technical English rules in
criminal pleading, *in favorem vitæ*, even though the reason no longer
exists, they ought, most certainly, to seek the aid of scientific research
and observation, for the same purpose.   Under the English rule, or
more properly *practice*, " either sane individuals are most improperly
acquitted on the plea of insanity, or others are most unjustly exe-
cuted."   Taylor's Med. Juris. 582, 3d ed.

Under the practice in this State, since the trial of *Prescott*, in 1834,
it is believed that the decision of juries, in this class of cases, has been
uniformly correct.   By our statute, if the verdict be " not guilty by
reason of insanity," the prisoner does not go free, but it is the duty
of the court to commit him to the asylum or prison for safe keeping.
Gen. St. 494.

LADD, J.   The court found, as matter of fact, that Goodrich would
weigh the evidence under a conscientious bias against capital punish-
ment, and that for this reason he would not be an impartial or indiffer-
ent juror.   It is well understood that this court does not ordinarily
revise a finding of fact by the court at the trial term ; and we can see
no reason for doing so in the present case.   This was a matter within
the discretion of the court below ; *Watson* v. *Walker*, 33 N. H. 131 ;
*State* v. *Pike*, 49 N. H. 399 ;—and we think the evidence reported was
amply sufficient to warrant the finding.

This court has recently considered with much care, in the case of
*State* v. *Pike*, above referred to, the sufficiency of the form of indict-
ment objected to here.   Pike was convicted of murder in the first
degree on an indictment setting out the offence in the same form, and
it was held sufficient.   We have reëxamined the opinion in that case,
and considered again the reasons upon which it is placed, and are
again brought to the same result.   A majority of the court think the
indictment is sufficient to sustain a verdict of murder in the first
degree.

The question calling for what Mrs. Jones said to the witness Page,
not in defendant's presence, was inadmissible.   The case finds that no
part of any conversation, to which the question proposed had relation,
had been put in, and the declarations of Mrs. Jones, under the cir-
cumstances shown, would be hearsay.

The statement of Drew to Bennett, in regard to the defendant's
mental condition, was properly excluded for the same reason.

Remarks made to Bennett by other persons, not in defendant's pres-
ence, calling his attention to defendant's mental condition, were rightly
excluded because they were hearsay.

Whether Drew did or did not say anything to Bennett on account
of what took place on the boat, would seem to be wholly immaterial.
Drew was a witness, and could testify to all he knew, that was ad-

missible, upon the question of defendant's sanity or insanity, whether it took place on the boat or elsewhere; and whether he communicated to Bennett the same facts, or the conclusion which he drew from them, could have no bearing one way or the other, as we can see.

There was evidence tending to show that the defendant believed his wife guilty of adultery with one French, and that he killed her for that reason. His counsel claimed that this belief was an insane delusion. There was also evidence tending to show that, during the trial, the defendant had said his belief in his wife's infidelity was founded, not only on public rumor, but also on his own observation. The claim that this belief was an insane delusion was a direct and distinct claim that no such public rumor existed; for, whatever difference there may be on other points, all must agree that a belief in what had actual existence would not be an insane delusion. Whether there was, in fact, such a public rumor, was thus put directly in issue; and to meet this issue, evidence that such a public rumor did exist in Newmarket, where defendant and his wife lived, was relevant, and properly admitted.

The history of the defendant, and evidence of his conduct at various times during a period of many years before the act for which he was tried, tending to show his temper, disposition, and character, were admitted against his objection. It was for the jury to say whether the act was the product of insanity, or of a naturally malignant and vicious heart. The condition of the man's mind, whether healthy or diseased, was the very matter in issue. This must be determined, in some way or other, from external manifestations, as exhibited in his conduct. To know whether an act is the product of a diseased mind, it is important to ascertain, if possible, how the same mind acts in a state of health. The condition of sanity or insanity shown to exist at one time, is presumed to continue. For these reasons, and others which we have not thought it necessary to enlarge upon, it would seem that evidence tending to show defendant's mental and moral character and condition for a period of many years before the act, was properly received.

The remaining and most important questions in the case arise upon the instructions given by the court to the jury, and the refusal to give instructions requested by defendant's counsel.

When, as in this case, a person charged with crime admits the act, but sets up the defence of insanity, the real ultimate question to be determined seems to be, whether, at the time of the act, he had the mental capacity to entertain a criminal intent—whether, in point of fact, he did entertain such intent.

"In solving that problem, as in all other cases, it is for the court to find the law, and for the jury to find the fact. The main question for our consideration here is, what part of this difficult inquiry is law, and what part fact.

It will be readily agreed, as said by SHAW, C. J., in *Com.* v. *Rogers*, 7 Met. 500, that if the reason and mental powers of the accused are either so deficient that he has no will, no conscience, or controlling mental power, or if, through the overwhelming violence of mental

disease his intellectual power is for the time obliterated, he is not a responsible agent, and, of course, is not punishable for acts which otherwise would be criminal.

But experience and observation show that, in most of the cases which come before the courts, where it is sufficiently apparent that disease has attacked the mind in some form and to some extent, it has not thus wholly obliterated the will, the conscience, and mental power, but has left its victim still in possession of some degree of ability in some or all these qualities. It may destroy, or it may only impair and becloud the whole mind; or, it may destroy, or only impair the functions of one or more faculties of the mind. There seem to be cases where, as Erskine said in *Hadfield's* case, reason is not driven from her seat, but where distraction sits down upon it along with her, holds her trembling upon it, and frightens her from her propriety.

The term, partial insanity, has been applied to such cases by writers and judges, from Lord Hale to Chief Justice Shaw, where, as has been said, " the mind may be clouded and weakened, but not incapable of remembering, reasoning, and judging ;" and it is here that the difficulty of the subject begins, and that confusion and contradiction in the authorities make their appearance. " No one can say where twilight ends or begins, but there is ample distinction between night and day." We are to inquire whether a universal test has been found wherewith to determine, in all cases, the line between criminal accountability and non-accountability—between the region of crime and innocence—in those cases which lie neither wholly in the darkness of night nor the light of day. If such a test exists or if one can be found, it is of the utmost importance that it be clearly defined and broadly laid down, so that when it is given to a jury it may aid rather than confuse them. To ascertain whether a rule has hitherto been found, we must look to the authorities ; and so far as we have been able to examine them, the leading and familiar English cases and authorities are substantially as follows :

Lord Hale said the mental capacity ordinarily possessed by a child fourteen years old, was the test.

Mr. Justice Tracey, in *Arnold's* case (1723), said : " A man must be totally deprived of his understanding and memory, so as not to know what he is doing, no more than an infant, a brute, or a wild beast ;" 16 Howell's St. Tr. 764 ;—and the same doctrine, substantially, seems to have been acted on in *Ferrer's* case, 19 St. Tr. 947.

The next prominent case in the books is *Hadfield's* case (1800) ; and all I desire to say of that case, in this connection, is, that it seems to stand by itself. It was clear that Hadfield knew right from wrong ; it was clear that he knew the nature of the act he was about to commit ; it was clear he manifested design, foresight, and cunning in planning and executing it ; and it was clear he knew it would subject him to punishment, which was, indeed, his motive in committing it. The most that can be said of it is, that everybody saw he was insane, and that his insanity produced the act.

Next come three cases tried in the year 1812,—*Parker's* case, re-

ported in Collinson on Lunacy 477, *Bowler's* case, *id.* 673, and *Bellingham's* case; in each of which a more humane rule than that of Mr. Justice TRACEY was adopted, namely, that knowledge of right and wrong, considered as abstract qualities, was the test; although in *Bowler's* case Mr. Justice LE BLANC added a further test, clearly suggested by and growing out of the facts of that particular case, and designed to furnish the rule by which the jury should be guided in deciding it, rather than by the formula in respect to right and wrong, namely, that it was for the jury to determine whether the prisoner was under any illusion in respect to the prosecutor, which rendered his mind, at the moment, insensible of the nature of the act he was about to commit. And in *Bellingham's* case, Sir JAMES MANSFIELD, C. J., took the extraordinary liberty of changing the whole scope and meaning of the rule by telling the jury, in addition, that " it must be proved beyond all doubt that, at the time he committed the atrocious act, he did not consider that murder was a crime against the laws of God and nature."

It can hardly be contended that these three cases go far towards establishing a *rule;* for there is not much reason in calling that a rule, which the judge at the trial may feel at liberty to change, for the purpose of bringing about a conviction or acquittal, according to his individual view of the facts appearing in the case before him.

But these remarks of MANSFIELD, C. J., were approved by Lord LYNDHURST in *Rex* v. *Offord*, 5 C. & P. 168 (1831), although he, in the same breath, or at least in the same charge to the jury, laid down another and a new test, which seems to be entirely inconsistent with the rule in *Bellingham's* case, namely, that the jury must be satisfied, before they could acquit the prisoner on the ground of insanity, that he did not know, when he committed the act, what the effect of it, if fatal, would be with reference to the crime of murder. This is not so clear as might be desired, but I should suppose it would strike the average apprehension of a jury as about equivalent to telling them that he must know that the killing would be murder; which is a qualification of the rule as much in favor of life as Sir JAMES MANSFIELD'S was in favor of death.

In *Regina* v. *Oxford*, 9 C. & P. 525 (1840), Lord DENMAN charged the jury: " If some controlling disease was in truth the acting power within him, which he could not resist, then he will not be responsible. It is not more important than difficult to lay down a rule by which you are to be governed * * * * * * * * * *. On the part of the defence, it is contended that the prisoner was *non compos mentis,* that is (as it has been said), unable to distinguish right from wrong; or, in other words, that from the effect of a diseased mind he did not know at the time that the act he did was wrong * * * *. Upon the whole, the question will be, whether all that has been proved about the prisoner at the bar shows that he was insane at the time when the act was done; whether the evidence given proves a disease in the mind as of a person quite incapable of distinguishing right from wrong. Something has been said about the power to contract, and to make a will. But I think those things do not supply any test. The question

is, whether the prisoner was laboring under that species of insanity which satisfies you that he was quite unaware of the nature, character, and consequences of the act he was committing, or, in other words, whether he was under the influence of a diseased mind, and was wholly unconscious at the time he was committing the act that it was a crime."

But three years afterwards, in *Regina* v. *Higginson*, 1 Car. & Kir. 129, Mr. Justice MAULE, apparently in utter disregard of the elaborate charge of Lord DENMAN in *Regina* v. *Oxford*, said to the jury : " If you are satisfied that the prisoner committed this offence, but you are also satisfied by the evidence that at the time of the committing of the offence the prisoner was so insane that he did not know right from wrong, he should be acquitted on that ground; but, if you think that at the time of the offence he did know right from wrong, he is responsible for his acts, although he is of weak intellect."   And again, in 1848, in *Regina* v. *Stokes*, the same test,—knowledge of right and wrong in the abstract,—was applied by Baron ROLFE, who said: " Every man is held responsible for his acts by the laws of his country, if he can discern right from wrong."

The numerical preponderance of authority in England, as gathered from the cases thus far, would seem to be decidedly in favor of the rule that knowledge of right and wrong, without reference to the particular act, is the test; although their force is much shaken, if not wholly overthrown, by the qualifications which judges have seemed to feel at liberty to introduce, to meet their individual views, or the exigencies of particular cases ; and especially by the charge of Lord DENMAN in *Regina* v. *Oxford.*

The memorable effort of the House of Lords, in 1843, to have the confusion and conflict of opinion which had arisen on this perplexing question all cleared away by one distinct and full avowal by the judges of what the law was and should be in relation to it, is too conspicuous in the history of the subject to be passed without notice.

It may safely be said that the character of the judges, and the circumstances under which the questions in *McNaughten's* case (see note to *Regina* v. *Higginson*, 1 Car. & Kir. at p. 130) were propounded to them by the House of Lords, make it morally certain that if, in the nature of things, clear, categorical, and consistent answers were possible, such answers would have been given.   In other words, that if a safe, practical, legal test exists, it would have been then found by those very learned men, and declared to the world.   Such a result would have brought order out of chaos, and saved future generations of lawyers and judges a vast amount of trouble in trying this kind of cases. But an examination of the answers given shows that they failed utterly to do any such thing ; and it is not too much to say that, if they did not make the path to be pursued absolutely more uncertain and more dark, they at best shed but little light upon its windings, and furnish no plain or safe clue to the labyrinth.

In answer to the first question, all the judges, except MAULE, say that " notwithstanding the party accused did the act complained of

with a view, under the influence of insane delusion, of redressing or re-
venging some supposed grievance or injury, or of producing some pub-
lic benefit, he is nevertheless punishable, according to the nature of the
crime committed, if he knew at the time of committing such crime that
he was acting contrary to law, by which is meant the law of the land."
Here is an entirely new element—knowledge that he was acting con-
trary to the law of the land; and hereupon the inquiry arises, Is a man,
acting under a delusion of this sort, presumed to know the law of the
land? The answer must be, Yes; for the judges say, further on:
" The law is administered upon the principle that *every one* must be
taken conclusively to know the law of the land, without proof that he
does know it."

Let this proposition be examined a moment. Knowledge that the
act was contrary to the law of the land is here given as a test; that is,
such knowledge is assumed to be the *measure* of mental capacity suffi-
cient to entertain a criminal intent. By what possible means, it may
be asked, can that test or measure be applied, without first finding out
whether the prisoner, in fact, knew what the law of the land was?
How could a jury say whether a man knew, or did not know, that an
act was contrary to the law of the land, without first ascertaining
whether he knew what that law was?

It was like saying that knowledge of some fact in science,—as, for ex-
ample, that a certain quantity of arsenic taken into the stomach will
produce death,—shall be the test, and at the same time saying that it
makes no difference whether the prisoner ever heard of arsenic, or
knows anything of its properties or not. Knowledge that the act is
contrary to law might be taken as a measure of capacity to commit
crime, and so might knowledge of any other specific thing that should
be settled upon for that purpose; and such a test would be consistent
and comprehensible, whether it were right or not; but when it is said
that knowledge of a certain thing is the test, and then we are told in
the next paragraph that it makes no difference whether the man ever
heard of the thing or not, I confess that I am not able to see any open-
ing for escape out of the maze into which we are led. Whether a jury
would be more successful, must depend, I suppose, on their compara-
tive intelligence.

In connection with this rule, it is useful to bear in mind that Had-
field knew he was doing an illegal act, and did it for the avowed pur-
pose of bringing upon himself the punishment which he knew was
the legal consequence of the act.

MAULE, J., holds that the general test of capacity to know right
from wrong in the abstract, is to be applied in the case supposed by
the first question, the same as in any other phase of mental unsound-
ness.

In answer to the second and third questions, which relate to the
terms in which the matter should be left to the jury, the judges say
that " to establish a defence on the ground of insanity, it must be
clearly proved that, at the time of committing the act, the party ac-
cused was laboring under such a defect of reason from disease of the

mind as not to know the nature and quality of the act he was doing, or, if he did know it, he did not know he was doing what was wrong."

Suppose, now, an insane man does an act which he knows to be contrary to law, because from an insane delusion (if that term amounts to anything more than the single term insanity) he believes it to be right notwithstanding the law, that the law is wrong, or that the peculiar circumstances of the case make it right for him to disregard it in this instance: how are these two rules to be reconciled ? It would seem to be plain that they are in hopeless conflict, and cannot both stand.

MAULE, J., says : "The questions necessarily to be submitted to the jury are those questions of fact which are raised on the record. In a criminal trial the question commonly is, whether the accused be guilty or not guilty ; but in order to assist the jury in coming to a right conclusion on this necessary and ultimate question, it is usual and proper to submit such subordinate or intermediate questions as the course which the trial has taken may have made convenient to direct their attention to. What these questions are, and the manner of submitting them, is matter of discretion for the judge,—a discretion to be guided by a consideration of all the circumstances attending the inquiry. In performing this duty, it is sometimes necessary or convenient to inform the jury as to the law"—which, he repeats, is knowledge of right and wrong. He also says, there are no terms which the judge is by law required to use, only they must not be inconsistent with the law that knowledge of right and wrong is the test.

The answer to the fourth question introduces a doctrine which seems to me very remarkable, to say the least. The question was : " If a person, under an insane delusion as to existing facts, commits an offence, is he thereby excused ?" To which the answer was as follows : " On the assumption that he labors under partial delusion only, and is not in other respects insane, he must be considered in the same situation, as to responsibility, as if the facts, with respect to which the delusion exists, were real. For example : if, under the influence of delusion, he supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defence, he would be exempt from punishment. If his delusion was, that the deceased had inflicted a serious injury to his character or fortune, and he killed him in revenge for such supposed injury, he would be liable to punishment."

The doctrine thus promulgated as law has found its way into the text books, and has doubtless been largely received as the enunciation of a sound legal principle since that day. Yet it is probable that no ingenuous student of the law ever read it for the first time without being shocked by its exquisite inhumanity. It practically holds a man confessed to be insane, accountable for the exercise of the same reason, judgment, and controlling mental power, that is required of a man in perfect mental health. It is, in effect, saying to the jury, the prisoner was mad when he committed the act, but he did not use sufficient rea-

son in his madness. He killed a man because, under an insane delusion, he falsely believed the man had done him a great wrong, which was giving rein to a motive of revenge, and the act is murder. If he had killed a man only because, under an insane delusion, he falsely believed the man would kill him if he did not do so, that would have been giving rein to an instinct of self-preservation, and would not be crime. It is true, in words, the judges attempt to guard against a consequence so shocking, as that a man may be punished for an act which is purely the offspring and product of insanity, by introducing the qualifying phrase, " and is not in other respects insane." That is, if insanity produces the false belief, which is the prime cause of the act, but goes no further, then the accused is to be judged according to the character of motives which are presumed to spring up out of that part of the mind which has not been reached or affected by the delusion or disease. This is very refined. It *may be* that mental disease sometimes takes a shape to meet the provisions of this ingenious formula; or, if no such case has ever yet existed, it is doubtless within the scope of omnipotent power hereafter to strike with disease some human mind in such peculiar manner that the conditions will be fulfilled ; and when that is done, when it is certainly known that such a case has arisen, the rule may be applied without punishing a man for disease. That is, when we can certainly know that, although the false belief on which the prisoner acted was the product of mental disease, still, that the mind was in no other way impaired or affected, and that the *motive* to the act did certainly take its rise in some portion of the mind that was yet in perfect health, the rule may be applied without any apparent wrong. But it is a rule which can be safely applied in practice, that we are seeking ; and to say that an act which grows wholly out of an insane belief that some great wrong has been inflicted, is at the same time produced by a spirit of revenge springing from some portion or corner of the mind that has not been reached by the disease, is laying down a pathological and psycholgical fact which no human intelligence can ever know to be true, and which, if it were true, would not be *law*, but pure matter of fact. No such distinction ever can or ever will be drawn in practice ; and the absurdity as well as inhumanity of the rule seems to me sufficiently apparent without further comment.

To form a correct estimate of the value of these answers, we have only to suppose that, at the end of a criminal trial where the defence is insanity, they be read to the jury for their guidance in determining the question with which they are charged. Tried by this practical test, it seems to me, they utterly fail ; and the reason of the failure, as I think, is, that it was an attempt to lay down as law that which, from its very nature, is essentially matter of fact. It is a question of fact whether any universal test exists, and it is also a question of fact what the test is, if any there be.

The efforts of text writers to extract a rule from the cases have not, in my judgment, been more successful. See 1 Russ. Cr. 13 ; Roscoe's Cr. Ev. 944. It is worthy of notice, however, that Mr. Chitty lays

down a rule from which is excluded all reference to knowledge of right and wrong, or moral good and evil, thus :

" Where there is only such partial derangement as leaves the party free to act or to forbear in the particular case in question, or where he is guilty of the crime during a lucid interval, he will be equally liable to punishment with those who are perfectly sane. Where, however, the mind labors under such a delusion that, though it discerns some objects clearly, it is totally deranged as to the objects of its attack, the party will be entitled to be acquitted." 1 Ch. Cr. L. 725. To my mind this is but another form of saying that where the act is the product of mental disease it is not crime ; which was the instruction given in this case.

If we leave the English rule where it seems to be left by these authorities, I think an examination of the American cases will not lead to any more satisfactory result.

In *Commonwealth* v. *Rogers*, 7 Met. 500 (1844), SHAW, C. J., instructed the jury that " a person is not responsible for any criminal act he may commit, if, by reason of mental infirmity, he is incapable of distinguishing between right and wrong in regard to the particular act, and of knowing that the act itself will subject him to punishment ; or has no will, no conscience, or controlling mental power ; or has not sufficient power of memory to recollect the relations in which he stands to others, and in which they stand to him ; or has his reason, conscience, and judgment so overwhelmed by the violence of disease as to act from an uncontrollable impulse."

Here seem to be four distinct tests. The first is substantially that given by Lord DENMAN in *Regina* v. *Oxford*, but with one most important qualification added, namely, knowledge that the act will subject him to punishment. But how can it be said that such knowledge constitutes one of the links in a chain of conclusive evidence,—that it is one fact in a chain of facts from which that degree of insanity which will excuse a person from crime is to be conclusively found ?

If that be so, then certainly, a legal quality, effect, or significance is given to it by its position in the chain, which no one would ever think it possessed when standing alone. The desire for revenge may be so strong as to outweigh the fear of a punishment which a man without any mental disease knows must follow his act. But the rule is, that, in addition to the knowledge of right and wrong in respect to the particular act, the accused must have been capable of knowing that the act itself would subject him to punishment.

It is doubtless true that ability to know that a certain act will be followed by punishment, furnishes evidence of the mental condition. So would knowledge of any other fact in law or science. But I can see no more reason for holding that such knowledge is any part of a *legal test* of capacity to commit crime, than for holding that knowledge of the cause of an eclipse is entitled to the same effect.

The second rule relates to a case where there can be no doubt,— where the will, the conscience, and controlling mental power are all gone ; and the fourth is substantially the same,—where the reason,

conscience, and judgment are so overwhelmed by the violence of disease, that he acts from uncontrollable impulse.   There can be no very appreciable legal distinction between a person who has no will, no conscience, or controlling mental power, and one whose reason, conscience, and judgment are so overwhelmed by the violence of disease as to act from an uncontrollable impulse.   In both cases it is an act in which reason, conscience, judgment, and will do not participate; in a word, it is the product of mental disease.

Power of memory sufficient to recollect the relations in which he stands to others and in which others stand to him, which is given as the third test, seems to me no more a legal criterion, than power of memory to recollect any other fact which a healthy mind would be expected to remember; and such power of memory or its lack, would be a fact, like other facts, for the jury to weigh in judging whether he had the mental capacity to entertain a criminal intent.

There is no doubt but these instructions of the learned and eminent Chief Justice of Massachusetts have been largely followed in cases since tried in this country; but the course has been by no means uniform, as we shall see.

In New York and Pennsylvania, in the two leading cases of *Freeman* v. *People*, 4 Denio 9, and *Commonwealth* v. *Mosler*, 4 Barr. 267, capacity to distinguish right from wrong was given as the naked test. But in neither of those States has the rule thus laid down been followed with uniformity.   In the trial of *Huntington*, for forgery, in New York city, in 1856, Judge CAPRON said to the jury: "To constitute a complete defence, insanity, if partial, as monomania, must be such in degree as to wholly deprive the accused of the guide of reason *in regard to the act with which he is charged*, and of the knowledge that he is doing wrong in committing it."   And the remarks of EDMONDS, J., in the earlier case of *The People* v. *Kleim*, 1 Edm. S. Cas. 13, are wholly at war with any such rule as that promulgated in *People* v. *Freeman*.   He says: "The moral as well as the intellectual faculties may be so disordered by the disease as to deprive the mind of its controlling and directing power;—that he must know the act to be wrong and punishable, and be able to compare and choose between doing it and not doing it."

In Pennsylvania, in *Commonwealth* v. *Knepley* (1850), knowledge of right and wrong *in regard to the particular act* was given as the test; and in *Commonwealth* v. *Haskell*, the judge charged that "the true test lies in the word *power*.   Has the defendant in a criminal case the power to distinguish right from wrong, and the power to adhere to the right and avoid the wrong?"

It would probably not be far out of the way to say that the number of American cases where knowledge of right and wrong in the abstract, and knowledge of the nature and quality of the act,—that it was wrong,—have been given as the test, is about equal, with a tendency of late years to the latter form; while it will appear that, in almost every case where any rule has been given on the subject, it has been modified and explained to meet the facts of the particular

case, or to carry out the personal views of the judge on the matter of insanity.

But there are not wanting cases where all tests have been discarded. In *State* v. *Felter*, 25 Iowa 67, DILLON, C. J., says: "The jury, in substance, should be told that if the defendant's act in taking the life of his wife was caused by mental disease or unsoundness, which dethroned his reason and judgment with respect to that act, which destroyed his power rationally to comprehend the nature and consequences of that act, and which, overpowering his will, irresistibly forced him to its commission, then he is not amenable to legal punishment. But if the jury believe, from all the evidence and circumstances, that the defendant was in possession of a rational intellect and sound mind, and allowed his passions to escape control, then, though passion may for the time being have driven reason from her seat and usurped it, and have urged the defendant, with a force at the moment irresistible, to desperate acts, he cannot claim for such acts the protection of insanity." And in *Stevens* v. *The State of Indiana*, reported in the Am. Law Reg., Sept., 1870, which was an indictment for murder, and the defence insanity, an instruction to the jury that, if they believed the defendant knew the difference between right and wrong in respect to the act in question, if he was conscious that such act was one which he ought not to do, he was responsible, was held erroneous.

In the course of his opinion in that case, GREGORY, J., speaking of the charge in *Commonwealth* v. *Rogers*, said: "It is by no means clear, and we think it is not entitled to the weight usually awarded it."

Very much to the same effect was *State* v. *Spencer*, 1 Zabriskie 196. HORNBLOWER, C. J., said: "In my judgment the true question to be put to the jury is, whether the prisoner was insane at the time of committing the act; and in answer to that question there is little danger of a jury's giving a negative answer, and convicting a prisoner who is proved to be insane on the subject matter relating to or connected with the criminal act, or proved to be so far or so generally deranged as to render it difficult or almost impossible to discriminate between his sane and insane acts."

And, also, a case said to have been tried in York county, Maine, in 1836, where the court charged the jury that if they were satisfied the prisoner was not of sound memory and discretion at the time of committing the act, they were bound to return a verdict of acquittal. Ray. Med. Jurisp. Ins., § 42. To the same effect, also, are our own cases of *Prescott* and *Corey*, referred to by the attorney-general in his brief.

Professor Greenleaf adopts the charge of Chief Justice SHAW, in *Rogers'* case, without any attempt at modification or explanation, as covering the whole subject, so far as criminal responsibility is concerned. 2 Gr. Ev., § 372.

Mr. Bishop undertakes to give the forms in which courts have put the question of insanity to the jury in most of the modern cases. 1 Bish. Cr. L. 475. But I have not been able to find a case, ancient or modern, where the judge did actually give the question of insanity to the jury in just the terms of Mr. Bishop's form; and he says,

speaking of his rule: " This form of stating the question of insanity to the jury is well in cases where it is admitted that the mental disease or imperfection extends only to the intellectual powers, and the party has full control of his actions.  How numerous comparatively these cases are is matter of science and fact nowhere to be discussed." *Id.*, § 478.

In regard to the difficulties of the subject the same author says : " The labors of writers on insanity have been exhausted in attempts to find some test of ready application to determine when a person is to be deemed insane, and when not, in reference to his responsibility for crime.   And judges, less informed on this subject than on most other subjects of legal science, have struggled under the inherent embarrassments of the question itself, under the influence of erroneous notions in the community, and under the failures of counsel and witnesses in particular cases to present the real points of inquiry.  The result has been, that instructions given in reference to particular facts appearing in the cases before them have seemed, to casual observers, to be very discordant, while to scientific inquirers after the facts of insanity, they have seemed very absurd." *Id.*, § 474.   And in a note, " It seems to me there has been too much attempt to do what in its nature is impossible, and too little attempt to do what is possible regarding this matter. It is not, I submit, possible, in the nature of things, that the court should find an exact and literal rule which may be put into the hand of a juryman, wherewith to measure the mind, and determine whether it is criminally responsible or not, for its act."

It is to be remarked that the same thing, in substance, was admitted by the judges in *McNaughten's* case.   TINDAL, C. J., giving the opinion of the majority, said : " We have foreborne entering into any particular discussion upon the questions, from the extreme difficulty of applying those answers to cases in which the facts are not brought judicially before us.   The facts of each particular case must, of necessity, present themselves with endless variety, and with every shade of difference in each case ; and we deem it at once impracticable, and dangerous if it were practicable, to attempt to make minute applications of the principles involved in the answers to your Lordships' questions."

MAULE, J., speaking for himself, observed : " I feel great difficulty in answering the questions put by your Lordships on this occasion.  First, because they do not appear to arise out of, and are not put in reference to, a particular case, or for a particular purpose, which might explain or limit the generality of their terms, so that full answers to them ought to be applicable to every possible state of facts not inconsistent with those assumed in the questions."

It is entirely obvious that a court of law undertaking to lay down an abstract general proposition, which may be given to the jury in all cases, by which they are to determine whether the prisoner had capacity to entertain a criminal intent, stands in exactly the same position as that occupied by the English judges in attempting to answer the questions propounded to them by the House of Lords in this case ;

and whenever such an attempt is made, I think it must always be attended with failure, because it is an attempt to find what does not exist, namely, a rule of law wherewith to solve a question of fact.

This is the only conclusion I desire to draw from the cases and text writers referred to. It is clear to me that judges have adapted their language to the facts of the particular case before them; and that when anything is said about knowledge of right and wrong, or knowledge of the quality of the act, or any other legal test, it has been, and will inevitably continue to be, qualified and explained in such a way, to meet the evidence upon which the jury are to pass, that its character as a rule entirely disappears.

No one but the Creator of all things can look in upon the chaos of a disordered mind, and determine with certainty whether its powers are so much prostrated, enfeebled, or deranged, that the unhappy sufferer has ceased to be an accountable being. Still the court and jury must determine that question, approximately, as best they can in each individual case; and it makes no difference, so far as I can see, with the difficulty of the subject, whether Lord BROUGHAM'S view, that a distinction is to be made between the moral accountability of a man to his Maker and his accountability to human tribunals, be accepted or not. With this duty to perform, and this responsibility upon them, courts naturally and properly turn to men of science, such as have had large experience in the care and treatment of the insane, for aid ; and the questions allowed to be put to experts and answered by them, both in England and this country, show that what is laid down as *law* in theory, is almost universally treated as *fact* in practice.

At the trial where insanity is set up as a defence, two questions are presented :—First: Had the prisoner a mental disease ? Second : If he had, was the disease of such a character, or was it so far developed, or had it so far subjugated the powers of the mind, as to take away the capacity to form or entertain a criminal intent? The first is so purely a question of fact, that no one would think of disputing it any sooner than he would dispute that it was a question of fact whether a man has consumption or not. It is in settling the second that all the difficulty arises.

The instructions asked for in this case go upon the ground that this is a mixed question of law and fact; that where there is delusion there can be no criminal intent; and that, where there is capacity to know right from wrong in reference to the particular act, there is capacity to commit crime. It is true, the sixth request does not present the matter in just this form ; but if knowledge of right and wrong, as to the act, is to be considered a legal test of criminal accountability, it must follow that those who have such knowledge are accountable, as well as that those who have it not are not accountable. And this court is now called on, as a court of law, to decide whether either of these tests shall be adopted in this State ; and if so, which.

It would doubtless be convenient to adopt some such test. It would, to some extent, save the trouble of trying each case, as it arises, on its own special and peculiar facts; at any rate, it would

narrow the range. of investigation to a search for the facts constituting the test adopted. But in cases of this sort, the argument of convenience is not to be admitted. No formal rule can be applied in settling questions which have relation to liberty and life, merely because it will lessen the labor of the court or jury. Nor ought such a rule to be adopted upon the authority of cases, unless those cases show beyond a doubt not only its existence, but that it is founded in reason and fundamental truth. Expressions of even the most eminent judges must not be mistaken for the enunciation of a universal principle of law, when it appears that they were used in charging the jury upon the facts arising in a particular case.

The instructions given also imply that this is a mixed question of law and fact; that the only element of law which enters into it is, that no man shall be held accountable, criminally, for an act which was the offspring and product of mental disease. Of the soundness of this proposition there can be no doubt. Thus far all are agreed; and the doctrine rests upon principles of reason, humanity, and justice, too firm and too deeply rooted to be shaken by any narrow rule that might be adopted on the subject. No argument is needed to show that to hold that a man may be punished for what is the offspring of disease would be to hold that he may be punished for disease. Any rule which makes that possible cannot be law.

It will hardly be contended, I suppose, that delusion, or knowledge of right and wrong with reference to the act, or any other thing, can, with any degree of propriety, be called a *legal* test of the mental capacity to commit crime, unless that capacity is determined absolutely, in all cases, by the presence or absence of the fact which is assumed to constitute the test.

If we speak of *delusion*, for instance : before that can be adopted as the test, in the sense intended by the request in this case, it must appear that it makes no difference whether the delusion has any reference to or connection with the act or not. If we say, as ERSKINE said in *Hadfield's* case, that delusion is the test when it appears to have produced the act, but not when it does not appear to have produced the act,—that the delusion and the act should be connected,—we admit that delusion cannot be a *legal* test, because it is not a universal test.

And even if it were established, that in all cases where there is delusion there is not capacity to commit crime, with as much certainty as that a heavy body left free in the air will fall to the earth, it still remains a *fact*. That a heavy body will fall is a *fact*, although it is at the same time a law of nature: that delusion attends incapacity for crime would be a fact still, although, were the fact ascertained to be certain and universal, it might be called a law of mental disease, and might, therefore, be given to the jury as a criterion, without any positive or practical wrong.

Yet, in that view, it would be the law of the land in no other sense than the laws of nature and physics may be considered laws of the land. Now this court, sitting for the decision of questions of law,

is not at liberty to receive and consider evidence, or weigh and determine matters of fact.

But the very first step in the inquiry to ascertain if there be any test or criterion that may be safely given to the jury on this subject, whether as a fact universally true, or as a principle of law, involves the examination of an immense mass of evidence, as complicated and difficult to understand as can well be conceived. Moreover, it would require a degree of skill and scientific attainment which could only be reached by years of special study and intelligent observation. Not only ought all the facts bearing on the question to be collected from every asylum for the insane throughout the world, but, as an inflexible *rule* is to be established, the facts of all other cases, where the patient has never received scientific treatment, ought to be added to the stock. Then, after collecting the facts in this way, it would be necessary to compare cases and classes of cases one with the other, to weigh facts against facts, to balance theories and opinions, and finally to deduce a result which might itself turn out to be nothing more than a theory or opinion after all. At any rate it would be a deduction of fact.

It need not be said that this is not the business of a court of law. It is a work which can only be reasonably well done by men who devote their lives exclusively to its accomplishment. Such a work has doubtless been done, with extraordinary patience and ability, by our distinguished countryman, Dr. Ray; and the result of his laborious investigation is, that no test can be found. He says: "To persons practically acquainted with the insane mind, it is well known that in every hospital for the insane are patients capable of distinguishing between right and wrong, knowing well enough how to appreciate the nature and legal consequences of their acts, acknowledging the sanctions of religion, and never acting from irresistible impulse, but deliberately and shrewdly." Ray's Med. Jurisp. Ins., § 43.

If we were at liberty to weigh and consider *evidence* upon the question, it is clear that such testimony must outweigh all the convenient formulas and arbitrary dogmas laid down by lawyers and judges from the time of Lord HALE to the present, simply for the reason that Dr. Ray is qualified by study and observation to give an opinion, while lawyers and judges are not. But we do not consider evidence upon this point at all. Whether there is any universal test is as clearly a pure matter of fact, as is the question what that test may be.

A strong argument in favor of the instructions given in this case, and of consequence against proceeding further to give the specific instructions requested, is found, both upon principle and authority, in the course of decisions where testamentary capacity has been before the courts.

In the well known leading case of *Dew* v. *Clarke*, 3 Addams 79, decided in 1826, Sir JOHN NICHOLL gave his opinion thus: "The true criterion—the true test—of the absence or presence of insanity I take to be, the absence or presence of what, used in a *certain* sense of it, is comprehended in a single term, namely, delusion. Wherever the patient once conceives something extravagant to exist, which has still

no existence but in his own heated imagination ; and wherever, at the same time, having once so conceived, he is incapable of being, or at least of being *permanently,* reasoned out of that conception,—such patient is said to be under a *delusion,* in a peculiar *half-technical* sense of the term ; and the absence or presence of delusion, so understood, forms in my judgment the true and only test or criterion of absent or present insanity.   In short, I look upon delusion, in this sense of it, and insanity, to be almost if not altogether convertible terms ; so that a patient, under à delusion, so understood, on any subject or subjects, in any degree, is, for that reason, essentially mad or insane on such subject or subjects, in that degree."   ·

After a very extended review of the evidence in the case, he draws this conclusion : " The will propounded in this cause, a will virtually disinheriting the daughter, being the direct, unqualified offspring of that morbid delusion,—proved, I may now say without any qualification or restriction, to have been *ever* present to the mind of the deceased as to the character and conduct of his daughter—being, if I may so term it, the very creature of that morbid delusion, put into act and energy—I, at least, can arrive at no other conclusion than that the deceased was insane at the time of his making the will propounded in this cause ; and consequently that the will is null and void in law."

In view of this explicit avowal, it may be considered somewhat remarkable that this case should have been regarded as an authority for anything more than this,—that delusion is the test of testamentary capacity, so far that a disposition of property by a will, which is shown to have been the direct, unqualified ·offspring of morbid delusion, cannot be upheld.   If a morbid delusion produced the act, then the act is not valid.   But, whether through a misconception of this case, or by adopting the theory of some writers, who maintain that the mind, though it has varied faculties, is one and indivisible, so that if it be disordered in any one of these faculties it cannot be said to be sound though its other faculties and functions remain undisturbed, a doctrine appears to have gained some currency in England to. the effect that delusion on any matter, however remote from the subject of the will, and however disconnected from it, is conclusive evidence of unsoundness of mind, and, therefore, altogether destroys testamentary capacity. ·  *Waring* v. *Waring,* 6 Moore P. C. Cas. 341 ; and see, also, *Smith* v. *Tebbitt,* L. Rep., 1 P. & D. 398.

This idea was attacked and completely overthrown in the case of *Banks* v. *Goodfellow,* Law Rep., 5 Q. B. 549, decided in July, 1870.

In that case it appeared that a testator labored under two fixed delusions : one, that he was pursued by spirits ; the other, that a man, long since dead, came to molest him,—neither delusion influencing or calculated to influence the particular testamentary disposition made by him.   BRETT, J., who tried the case, left it to the jury to say whether, at the time of making the will, the testator was capable· of such knowledge and appreciation of facts, and was so far master of his intentions and free from delusions as would enable him to have a will of his own in the disposition of his property, and act upon it.

It will be observed that, if delusion were to be regarded as a universal legal test, there was no question here to be submitted to the jury: a verdict should have been ordered against the will, for the existence of delusions was not disputed.  But the instructions were held correct, and Lord Chief Justice COCKBURN, in the course of his elaborate opinion, says: " Every one must be conscious that the faculties and functions of the mind are various and distinct, as are the powers and functions of the physical organization.  The instincts, the affections, the passions, the moral sense, perceptions, thought, reason, imagination, memory, are so many distinct faculties or functions of the mind.  The pathology of mental disease, and the experience of insanity in its various forms, teach us that while on the one hand all the faculties, moral and intellectual, may be involved in one common ruin, as in the case of a raving maniac, one or more only of these faculties or functions may be disordered, while the rest are left unimpaired and undisturbed; that while the mind may be overpowered by delusions which utterly demoralize and unfit it for the perception of the true nature of surrounding things, or for the discharge of the common obligations of life, there often are, on the other hand, delusions which, though the offspring of mental disease, leave the individual in all other respects rational, and capable of transacting the ordinary affairs, and fulfilling the duties and obligations, incidental to the various relations of life."

The exact question presented to the court in this case, namely, whether unsoundness, not operating on the mind of the testator in regard to the particular testamentary disposition, will be sufficient to deprive him of the power of disposing of his property by will, was said to be a new question, not before presented for judicial decision in England.

But in *Boardman* v. *Woodman*, 47 N. H. 120, decided four years earlier in this State, the court below, BARTLETT, J., charged the jury " that the mere fact of the possession of a delusion may not be sufficient to render a person utterly incapable of making a valid will; that a person of sufficient mental capacity, though under a delusion, may make a valid will : if the will is in no way the offspring of the delusion, it is unaffected by it."

This instruction was sustained ; and I am unable to find anything in the opinion of the court that conflicts with the doctrine of *Banks* v. *Goodfellow*.  SARGENT, J., in the course of his opinion, says : " Delusion, in the technical sense, as explained by Sir JOHN NICHOLL, is the legal test of the presence of active insanity ; *and if the will is the offspring of this delusion, it should be set aside.*"

It is sufficiently obvious that neither Sir JOHN NICHOLL nor Judge SARGENT would hold that a man who labors under a delusion that his legs are made of glass, or that he is charged with controlling the motions of the planetary system, but is in other respects sane, would therefore be incapable of making a valid will.

It is not necessary here to express any assent to or dissent from the *manner* in which the subject is treated in *Dew* v. *Clarke* and *Boardman* v. *Woodman.*  Whether the inquiry is advanced by saying that the act,

to be invalid, must be the offspring of *delusion*, instead of saying that it must be the offspring of mental disease, is a matter which does not concern this argument.    See remarks of Lord PENZANCE in *Smith* v. *Tebbitt, sup.*    If the doctrine of *Banks* v. *Goodfellow* and *Boardman* v. *Woodman* be applied in the case under consideration, it would clearly have been error to give the instruction as to delusion requested by defendant's counsel ; because delusion cannot be a *legal* test, if, while delusions exist in the mind, an act no way connected with such delusions nor produced by them is to be held valid.

How far the analogy holds between testamentary capacity and capacity to commit crime, it is not necessary to inquire, because *delusion* has never, so far as I can find, been regarded as a test in criminal cases, unless *Hadfield's* case is to be excepted ; and all the argument requires is, to show that the rule, which it has been thought may be drawn from the authorities in civil cases, has no existence even there, in the broad and universal terms in which the court was requested to apply it on the trial of this case.

Fortunately we are not embarrassed by any decisions, or, so far as I know, any dicta or expressions of single judges in this State, at variance with the broad philosophical doctrine laid down by the judges who tried this case.    Indeed, there seems to have been a strong leaning heretofore in the same general direction, as is shown by the quotations from charges of two of our late chief justices, RICHARDSON and BELL, in the brief of the attorney-general for the State.

In view of these considerations, we are led to the conclusion that the instruction given to the jury in this case, that " If the defendant killed his wife in a manner that would be criminal and unlawful if the defendant were sane, the verdict should be 'not guilty by reason of insanity,' if the killing was the offspring or product of mental disease in the defendant," was right ; that it fully covers the only general, universal element of law involved in the inquiry ; and, therefore, that any further step in the direction indicated by the requests would have been an interference with the province of the jury, and the enunciation of a proposition which, in its essence, is not law, and which could not in any view safely be given to the jury as a rule for their guidance, because, for ought we can know, it might have been false in fact.

This would seem to dispose of the whole case.    All the other instructions given are only the direct logical consequence of this principle.

Whether the defendant had a mental disease, as before remarked, seems to be as much a question of fact as whether he had a bodily disease ; and whether the killing of his wife was the product of that disease, was also as clearly a matter of fact as whether thirst and a quickened pulse are the product of fever.    That it is a difficult question does not change the matter at all.    The difficulty is intrinsic, and must be met from whatever direction it may be approached. Enough has already been said as to the use of symptoms, phases, or manifestations of the disease as legal tests of capacity to entertain a criminal intent.    They are all clearly matters of evidence, to be

weighed by the jury upon the question whether the act was the off-spring of insanity: if it was, a criminal intent did not produce it; if it was not, a criminal intent did produce it, and it was crime.

The instructions as to insane impulse seem to be quite correct, and entirely within the same principle. If the defendant had an insane impulse to kill his wife, which he could not control, then mental disease produced the act. If he could have controlled it, then his will must have assented to the act, and it was not caused by disease, but by the concurrence of his will, and was therefore crime.

These instructions have now been twice given to the jury in capital cases in this State,—first, by Chief Justice PERLEY, in *State* v. *Pike*, and now again by Judge DOE, in the case before us. In *State* v. *Pike*, no exceptions were taken to this part of the charge, and the questions here raised were not before the whole court for judicial determination, although they were printed in the case as transferred, and no objection to their form is understood to have been made.

But a question was passed upon in that case, which, carried to its logical results, goes far towards settling most of the questions raised upon the instructions here. It was claimed that the defendant was irresponsible by reason of a species of insanity called dipsomania. The court instructed the jury that " whether there is such a mental disease as dipsomania, and whether the defendant had that disease, and whether the killing of Brown was the product of such disease, were questions of fact for the jury." These instructions were special-ly excepted to by the defendant, and were held correct. This would seem to be entirely inconsistent with the idea that either delusion or knowledge of right and wrong is, as matter of law, a test of criminal capacity; and would also seem to be about equivalent to holding, in general terms, that it was for the jury to say whether the killing was the product of mental disease, and return their verdict of " guilty," or " not guilty by reason of insanity," as they found that fact to be.

We should be slow to establish any doctrine on this important subject, which we could see would be likely to result in the escape of male-factors from punishment, or afford encouragement to a fictitious de-fence of insanity; and no considerations of convenience or ease in the administration of the law, as before observed, should be allowed to weigh at all against adhering to any doctrine or any course of practice that rests upon sound reason, or that appears to be necessary for the attainment of right results, whether such doctrine or practice is sup-ported by uniform authority or not.

Still it is no objection to the course of the judges who tried this case, and who tried *Pike's* case, that it relieves the subject of some of its most formidable difficulties so far as the court is concerned, and at the same time furnishes at least one clear and explicit direction which the jury can understand.

No untried or doubtful theory is adopted. The instruction given was always law, and always must be law, while justice is administered upon principles at all consonant with the calls of civilization and hu-manity. The only objection is, that the court did not go further, and

undertake to explore a region where all is doubt, uncertainty, and confusion upon the authorities, and where, upon principle, they had no right to go at all; that they did not undertake to lay down a rule where, if we could allow ourselves to investigate the fact, we should probably find there is and can be no rule, nor to enunciate as law a pure matter of fact which can only be absolutely known to the Almighty.

I may add, that it confirms me in the belief that we are right, or at least have taken a step in the right direction, to know that the view embodied in this charge meets the approval of men who, from great experience in the treatment of the insane as well as careful and long study of the phenomena of mental disease, are infinitely better qualified to judge in the matter than any court or lawyer can be. See Ray's Med. Jurisp. Ins., 5th ed., § 44.

The satisfaction with which the charge to the jury in *State* v. *Pike* is understood to have been received by the most enlightened members of the medical profession, proves to my mind, not that we have thrown down old landmarks to adopt any theory based on a partial, imperfect, or visionary view of the subject, but that, in a matter where we must inevitably rely to a great extent upon the facts of science, we have consented to receive those facts as developed and ascertained by the researches and observations of our own day, instead of adhering blindly to dogmas which were accepted as facts of science and erroneously promulgated as principles of law fifty or a hundred years ago.

The last instruction, that the defendant was to be acquitted on the ground of insanity unless the jury were satisfied beyond a reasonable doubt that the killing was not produced by mental disease, was in accordance with *State* v. *Bartlett*, 43 N. H. 224, and was correct.

*Exceptions overruled.*