Eugene C. CAMPBELL, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 16414.

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 22, 1961.

Decided March 29, 1962.

Petition for Rehearing En Banc
Denied June 12, 1962.

As Amended May 3, 1962.

Addendum June 28, 1962.

Burger, Circuit Judge, dissented.

Mr. Craig Mathews, Washington, D. C. (appointed by the District Court) for appellant.

Mr. David C. Acheson, U. S. Atty., with whom Messrs. Charles T. Duncan, Joseph A. Lowther, and Frank Q. Nebeker, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, WASHINGTON and BURGER, Circuit Judges.

WASHINGTON, Circuit Judge.

Appellant was convicted of robbery under two counts of an indictment. D.C. Code (1961) § 22–2901. After commitment to St. Elizabeths Hospital on August 29, 1960, to determine his competency to stand trial, appellant was adjudged competent on February 24, 1961. At the trial, held on April 18, 1961, he raised the defense of insanity. He did not seriously contest commission of the offenses. Two psychiatrists at St. Eliza-

beths, Dr. Owens and Dr. Dobbs, gave testimony indicating that defendant-appellant was suffering from an "emotionally unstable personality." In rebuttal, a psychiatrist who had never examined appellant testified that in his opinion emotional instability was not a mental disease. Appellant now seeks reversal of his conviction on three grounds.

## I.

Appellant first claims that the evidence introduced was such as to compel the trial court to grant his motion for a directed verdict of not guilty by reason of insanity. Appellant says, and we agree, that the testimony of the psychiatrist relied on by the Government was of little probative value. The psychiatrist had no information about defendant's mental condition, testified largely in terms of a legal conclusion, and had never seen defendant prior to the trial. On the other hand, appellant's evidence of insanity was far from conclusive. With regard to the existence of a mental disease, Dr. Owens and Dr. Dobbs testified that defendant possessed an emotionally unstable personality. The factors on which Dr. Owens based his diagnosis included the following: " * * this individual was extremely emotional. * * * He was quite tense and anxious, perspiring profusely." Dr. Dobbs testified that defendant, as an emotionally unstable personality, "reacts with excitability and ineffectiveness and may demonstrate poor judgment and in a sense has difficulty in his relationships with the people around him." Dr. Owens noted memory impairment both as to the time of the offenses and earlier, but Dr. Dobbs stated that defendant's memory seemed adequate except as to the offenses.

On the issue of causality, Dr. Owens testified only that the robberies "could have" been caused by appellant's mental condition. Dr. Dobbs, at various points in her testimony, said: "[Defendant], in all probability, could not refrain from committing the alleged offenses"; "We have no opinion as to the alleged offenses being a product of his mental condition or mental disease"; and "I don't know why he committed them [the offenses]."

■■ We have previously found error in the failure of the District Court to direct verdicts of not guilty by reason of insanity only where the evidence of mental disease has been very strong and the condition a serious one.[1] The two psychiatrists who testified for the defense labeled appellant as an "emotionally unstable personality," a broad classification which may include severe or relatively minor personality disorders. Although both psychiatrists agreed that appellant's particular condition constituted a mental disease, the existence or not of mental disease is ordinarily an issue exclusively for the jury. See, e. g., Stewart v. United States, 94 U.S.App. D.C. 293, 295, 214 F.2d 879, 881 (1954). As an administrative matter, "emotionally unstable personality" has been regarded by the staff at St. Elizabeths as a mental disease only since November 1957. Many of the symptoms relied on by Dr. Dobbs and Dr. Owens in arriving at their diagnoses (i. e., "tense," "anxious," "poor judgment") are possessed by people with relatively normal personality structures. Cross-examination below may have cast some doubt on the

---

1. See Fielding v. United States, 102 U.S. App.D.C. 167, 251 F.2d 878 (1957) (dementia praecox); Satterwhite v. United States, 105 U.S.App.D.C. 398, 267 F.2d 675 (1959) (paranoid schizophrenic); Wright v. United States, 102 U.S.App. D.C. 36, 250 F.2d 4 (1957) (schizophrenia established by testimony of at least five psychiatrists); Isaac v. United States, 109 U.S.App.D.C. 34, 284 F.2d 168 (1960) (schizophrenic, disassociative reaction, testimony of three psychiatrists and a clinical psychologist). Cf. Douglas v. United States, 99 U.S.App.D.C. 232, 239 F.2d 52 (1956) (new trial ordered, dementia praecox established by three disinterested psychiatrists, no medical evidence otherwise). As we have very recently said, "When we have ordered directed verdicts [in this class of case] it has been upon strong evidentiary grounds." Turberville v. United States, 112 U.S.App.D.C. 400, 303 F.2d 411.

thoroughness of the examination made by Dr. Owens. Given these facts, and with due regard to the opportunity of the jury to assess the credibility of the witnesses, we conclude that reasonable jurymen might find beyond a reasonable doubt that defendant was not insane.[2] The motion for a directed verdict was thus properly denied.

## II.

Appellant claims that the instructions delivered by the District Court on the issue of insanity were erroneous. The court first defined "mental disease" and "mental defect," in a manner not challenged here. The pertinent parts of the charge then read:

"Now, our legal and moral traditions require that those who, of their own free will and with evil intent, commit acts which violate the law shall be held criminally responsible for those acts, but the law and our moral traditions also require that a person is not to be punished for a criminal act if that act was the product of a mental disease or a mental defect. In other words, a defendant is not responsible for an act that is a violation of the law if he did not understand that his act was a violation of the law, or if he did, that he lacked the capacity to exercise his will so as to choose not to do it.

" * * * The relationship between the mental disease or defect and the act must be such as to justify a reasonable inference that the act would not have been committed if the person had not been suffering from the disease or defect. In other words, if because of some abnormal mental condition, the defendant did not understand that his act was a violation of the law or if he did understand but still he lacked the capacity to exercise his will and

choose not to commit the act, then he cannot be found guilty.

" * * * By the term 'product of' or 'critical causal relation' [between abnormal mental condition and criminal act] we mean to convey the idea that except for the abnormal mental condition the defendant would not have committed the acts.

"In other words, and by way of example: If, because of some abnormal mental condition the defendant had an impulse to rob which he could not control, then it may be said that the mental disease produced the act but if he could have controlled it and refrained from doing the act, then his will must have assented to the act, and it was not caused by the disease, but by the concurrence of his will and he was therefore responsible for his act.

"Therefore, to hold the defendant guilty or responsible for his criminal act, the jury must find * * *.

"(1) That the defendant committed the acts constituting the violation of the law for which he is charged, and

"(2) That the defendant understood that the act charged was a violation of the law, and

"(3) That he possessed the capacity to exercise his will so as to choose to do or not to do the act.

*      *      *      *      *      *

"If * * * the Government has proved all of the elements of the crime charged * * * and has proved beyond a reasonable doubt that the defendant understood that the act was a violation of law and that he had the capacity to exercise his will and to choose to do the acts or to refrain from doing the acts, that is that the acts were not a

---

2. This is not to say, of course, that under other circumstances a defendant suffering from an emotionally unstable personality may not be able to make such

a strong showing as to entitle him to a directed verdict of not guilty by reason of insanity. But that is not this case. The question here was one for the jury.

product of a mental disease or defect, then you may find the defendant guilty of the offense charged."

■ In the District of Columbia, the test of criminal responsibility is whether the offending act is the product of a mental disease or defect. Upon that issue, "the jury's range of inquiry is not to be limited to particular symptoms, but may include, under proper instructions, any symptoms and manifestations of mental disorder." Misenheimer v. United States, 106 U.S.App.D.C. 220, 221, 271 F.2d 486, 487 (1959), cert. denied, 361 U.S. 971, 80 S.Ct. 603, 4 L.Ed.2d 550 (1960).

■■ There was some testimony in this case bearing on Campbell's capacity for control.[3] Hence, we may assume that it would have been proper to give a brief instruction, telling the jury it might consider evidence of lack of capacity as tending to show that the offenses resulted from a mental disorder, and that

evidence of capacity could be considered as tending to show the contrary.[4] But here, the trial court, by its emphasis, explicit language, and repetition, in effect made the "right-wrong" test, coupled with "capacity to exercise his will so as to choose to do or not to do the act," the controlling criteria for imposing criminal responsibility.[5] The charge at length admonished the jury to consider whether defendant had the capacity to choose, or whether he understood that his act was a violation of law. In that part of the instruction which we have not quoted, the court refers three more times to appellant's capacity to exercise his will or to control his conduct. Moreover, the erroneous impression which may have been left with the jury was not corrected by explicitly telling them either (1) that capacity to choose is only one of several considerations in determining whether the act in question was the product of mental disease,[6] or (2)

3. It should be noted that the testimony as to capacity was presented only *after* the judge had informed counsel that he would charge the jury in terms of "right-wrong" and capacity.

4. In Hotema v. United States, 186 U.S. 413, 22 S.Ct. 895, 46 L.Ed. 1225 (1902), the evidence adduced was given in terms of the M'Naghton Rule and irresistible impulse. The trial court charged the jury in those terms, saying in part:
"* * * the burden is upon the government to establish that he was of sound mind, and by that term is not meant that he was of perfectly sound mind, but that he had sufficient mind to know right from wrong, and knowing that the act he was committing at the time he was performing it was a wrongful act in violation of human law, and he could be punished therefor, and that he did not perform the act because he was controlled by irresistible and uncontrollable impulse. In that state of case the defendant could not be excused upon the ground of insanity, and it would be your duty to convict him." (186 U.S. at 417, 22 S.Ct. at 897)
The approval given by the Supreme Court to the charge just quoted cannot mean that the M'Naghten Rule and the irresistible impulse test are the sole criteria in every case where insanity is the defense, re-

gardless of the evidence offered. Compare Burns v. United States, 274 U.S. 328 at 332, 47 S.Ct. 650, 71 L.Ed. 1077 (1927). Nor can it mean that the adoption by this court of the Durham Rule for this jurisdiction was beyond our authority, cf. Fisher v. United States, 328 U.S. 463 at 476, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946), or was otherwise improper. The Hotema case approved a particular charge given under particular circumstances: it does not say that that charge is the only one which can be given, or that other tests cannot properly be adopted.

5. As to that part of the instruction which deals with defendant's capacity to distinguish right from wrong, we said in Douglas v. United States, 99 U.S.App. D.C. 232, 238, 239 F.2d 52, 58 (1956), that "where a proper evidential foundation is laid a trial court should permit the jury to consider such criteria in resolving the ultimate issue 'whether the accused acted because of a mental disorder'." Here, there is considerable doubt as to whether such evidential foundation existed. Since we are reversing because of other defects in the instruction, however, it is unnecessary for us to rule on this point.

6. The Government cites language in Douglas v. United States, 99 U.S.App.D.C.

that it cannot be an affirmative test of criminal responsibility.

In addition, the instruction is quite inconsistent with two of our opinions which have gone to great pains to explain Durham. In Douglas v. United States, 99 U.S.App.D.C. 232, 238, 239 F.2d 52, 58 (1956), we said:

"* * * the court may permit the jury to consider whether or not the accused understood the nature of what he was doing and whether or not his actions were due to a failure, *because of mental disease or defect, properly to control his conduct.*" (Emphasis added.)

The emphasized words place the problem in its proper perspective: they show that failure to control conduct because of mental disease or defect may be considered in deciding whether the defendant should be relieved from criminal responsibility. The thrust of the trial court's charge in this case was quite different. As we shall see, it may well have led the jury to believe that capacity to refrain from doing the act was the overriding determinant of criminal responsibility.

█ In Carter v. United States, 102 U.S.App.D.C. 227, 236, 252 F.2d 608, 617 (1957), we explained that the defendant was entitled to a judgment of not guilty by reason of insanity if he would not

have committed the offense "but for" or "except for" the mental disorder. We insisted only that the mental disease make an "effective or decisive difference between doing and not doing the act," ibid., even if other factors or reasons combine to cause commission of the offense. In contrast, the instruction given here could reasonably have been interpreted by the jury to require that the mental disease or defect be so severe that it must completely obliterate defendant's "capacity to exercise his will." More important, in Carter we explained with great care what we meant when we said that the defense of insanity requires that the act be a "product of" a disease. We spoke in terms of a "critical" relationship, and described "product of" in terms of phrases such as "because of," "but for," and "result of." [7] The instruction below now seeks to brush all of this aside and use entirely different terminology as the overriding criterion of "product of." Here the court said that if the defendant "could have controlled it [the impulse to rob] and refrained from doing the act, then his will *must* have assented to the act, *and it was not caused by the [mental] disease,* but by the concurrence of his will and he was therefore responsible for his act." (Emphasis added.) In explicit language the court below thus says that the controlling

---

232, 238, 239 F.2d 52, 58 (1956); Stewart v. United States, 101 U.S.App.D.C. 51, 54, 247 F.2d 42, 44 (1957); and Wright v. United States, 102 U.S.App.D.C. 36, 44, 250 F.2d 4, 12 (1957).

In effect, these cases hold that evidence is admissible concerning the defendant's inability to distinguish between right and wrong, or his being subject to an irresistible impulse. There is a great difference, however, between admitting evidence on "right-wrong" or irresistible impulse, and making those symptoms the ultimate test of criminal responsibility.

7. "When we say the defense of insanity requires that the act be a 'product of' a disease, we mean that the facts on the record are such that the trier of the facts is enabled to draw a reasonable inference that the accused would not have committed the act he did commit if he had not been diseased as he was. There

must be a relationship between the disease and the act, and that relationship, whatever it may be in degree must be, as we have already said, critical in its effect in respect to the act. By 'critical' we mean decisive, determinative, causal; we mean to convey the idea inherent in the phrases 'because of', 'except for', 'without which', 'but for', 'effect of', 'result of', 'causative factor'; the disease made the effective or decisive difference between doing and not doing the act. The short phrases 'product of' and 'causal connection' are not intended to be precise, as though they were chemical formulae. They mean that the facts concerning the disease and the facts concerning the act are such as to justify reasonably the conclusion that 'But for this disease the act would not have been committed.'" Carter v. United States, 102 U.S.App. D.C. at 236, 252 F.2d at 617.

test of whether the act was "caused" by the mental disease is whether defendant could have controlled an impulse to rob.[8] All of the explanatory language in Carter is thus brushed aside; whether there is a "critical causal relationship" or whether the act would have occurred "but for" a mental disorder now is to be measured and decided by the jury on the basis of an entirely different standard.

The point can be illustrated by assuming a situation where the defendant admits commission of the act and the jury finds that (1) defendant suffered from a mental disease or defect, and (2) a "determinative" element causing the offense was the disease or defect. In such a situation the instruction here, by its overriding and persistent emphasis on the term "capacity," would clearly leave room for the implication that apart from elements (1) and (2) the jury could consider, as a wholly separate, independent and controlling question, whether (3) the accused had the "capacity" to refrain from the act. Although Durham encompasses consideration of (3) in determining (1) and (2), it ends the inquiry once they are established. Here the court could have foreclosed the implication that (3) was something different and apart from either (1) or (2) by telling the jury in unmistakably clear terms that elements (1) and (2), if found, are plainly inconsistent with the existence of "capacity." But it did not.

To subject a person suffering from a severe mental disorder, who would not have committed the criminal act but for his disorder, to the sanctions of imprisonment or perhaps execution would offend our sense of morality and justice. As we said in Durham: "The legal and moral traditions of the western world require that those who, of their own free will and with evil intent (sometimes called *mens rea*), commit acts which violate the law, shall be criminally responsible for those acts. Our traditions also require that where such acts stem from and are the product of a mental disease or defect as those terms are used herein, moral blame shall not attach, and hence there will not be criminal responsibility." See Durham v. United States, 94 U.S. App.D.C. 228 at 242, 214 F.2d 862 at 876, 45 A.L.R.2d 1430. And "If [the defendant's] violent act * * * sprang from mental disorder—if, indeed, he has a mental illness which makes it likely that he will commit other violent acts when his sentence is served, imprisonment is not a remedy. Not only would it be wrong to imprison him, but imprisonment would not secure the community against repetitions of his violence. Hospitalization, on the other hand, would serve the dual purpose of giving him the treatment required for his illness and keeping him confined until it would be safe to release him." Williams v. United States, 102 U.S.App.D.C. 51, 58, 250 F.2d 19, 26 (1957). A similar view was expressed in Overholser v. Lynch, 109 U.S.App.D.C. 404, 288 F.2d 388, cert. granted, 366 U.S. 958, 81 S.Ct. 1936, 6 L.Ed.2d 1252 (1961).

Since we are holding only that the instruction below was inconsistent with the law in this jurisdiction, we consider inappropriate an extended discussion of the substantive deficiencies and practical disadvantages inherent in the standards it expresses.[9] We have no question that the charge given here does not conform to our prior decisions. In no sense could it be called an "explanation" of the rule governing the insanity defense in the District of Columbia. What the trial judge has in effect done is to reject Durham and to substitute some kind of "right-wrong" plus "capacity" test. To sustain the present instruction would also, as we have pointed out, require repudiation of Douglas and Carter as well.

---

8. The jury was thus in substance told that the defendant should be held criminally responsible if he could have controlled an impulse to rob. Such an instruction is in our view patently erroneous.

9. Compare Report of the Royal Commission on Capital Punishment 111–12 (1949–53), rejecting the so-called capacity test.

For these reasons, we conclude that the challenged instruction was erroneous, and that reversal must follow.

### III.

■ Finally, appellant alleges error in the refusal of the District Court to admit into evidence a prior finding of incompetency to stand trial. As a technical matter, we need not reach that issue, since we are reversing on another ground. Nor as a practical matter is it necessary for us to decide the question in order to avoid error when Campbell is tried again in the District Court. Appellant's counsel, in his opening statement, told the jury: "We'll further show that * * * those psychiatrists determined that the defendant was not even mentally competent to stand trial." At this point, the prosecutor interrupted, and asked for a special instruction to the jury to disregard the comment. The court gave the requested instruction, and admonished defendant's counsel not to present evidence on the subject. None was offered. On this record, it is not clear whether defendant wanted to present the bare legal conclusion of incompetency or only the psychiatric evidence which served as the basis of that conclusion. If the latter, there is little doubt that such evidence, if offered again in the new trial, will be admissible on the same basis as any other information pertinent to defendant's condition at or near the time of the offense. The question whether the simple conclusion of incompetency to stand trial is admissible as some evidence of insanity thus may never arise in this case and need not be decided now.

For these reasons, the judgment will be reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

So ordered.

BURGER, Circuit Judge (dissenting).

Two very important and fundamental points are at issue in this case. The first is that the majority, while purporting to follow our prior holdings is in fact departing from them by refusing to allow the product test to be explained to the jury in the very terms we explained it in Durham v. United States, 94 U.S.App.D. C. 228, 214 F.2d 862, 45 A.L.R.2d 1430 (1954), and later cases. The second point is that the majority is again giving judicial approval to the extraordinary process by which a small segment of the medical profession alters the scope of the law of criminal responsibility by the simple device of "administratively" expanding the definition of mental disease from time to time. This was done once before by changing the definition of mental disease to include psychopathic or sociopathic personality [1] which like "emotionally unstable personality" was not classified as a mental disease when we adopted the "disease-product" test.

### (1)

### *Majority Holding of Error in Jury Charge*

Finally we have a case which presents the issue, sharply drawn, whether we are to abandon even the form of the "legal and moral traditions" which this court said "require that those who, of their own free will and with evil intent * * commit acts which violate the law shall be criminally responsible * * *." [2] This opinion gains added significance in that Judges Bazelon and Washington were members of the division which decided Durham v. United States.

In the case now before us the District Judge was confronted with what is the typical "insanity" situation in this jurisdiction, i. e., a case in which at least one witness expressed a conclusion that the accused acted abnormally or strongly or had a "mental disease." According-

---

1. See In re Rosenfield, D.C., 157 F.Supp. 18 (1957). See also discussion in Blocker v. United States, 110 U.S.App.D.C. 41 at 47–50, 288 F.2d 853 at 859–862.

2. Durham v. United States, 94 U.S.App. D.C. 228, 214 F.2d 862 (1954).

ly the court instructed the jury fully and precisely as provided by the Durham opinion. He then went on to explain the law, expressly referring to our urgent admonition in Carter v. United States, 102 U.S.App.D.C. 227, 252 F.2d 608 (1957), that the trial judges "ought to explain—not just state by rote" the meaning of our Durham standard.[3] The majority opinion now holds that giving such an explanation as was given here is reversible error. One need only read the entire charge, particularly the portion quoted hereafter, in order to see that the majority relies on hyperbole rather than on reasoned analysis.

The majority opinion does not state with any precision what parts of the trial court's charge constituted reversible error except as in a footnote we are told that it was "patently erroneous" to charge the jury

> "in substance * * * that the defendant should be held criminally responsible *if he could have controlled an impulse to rob.* * * *" (Emphasis added.)

This holding, I suggest, seeks to cut the very thin thread by which we appeared to follow to the "basic postulate" that wilful acts in violation of law are punishable.

Up to 1954 we followed what was loosely described as the McNaghten Rule although the substance of that doctrine had been almost entirely altered by this court's 1929 opinion in Smith v. United States, 59 App.D.C. 144, 36 F.2d 548, 70 A.L.R. 654. When we adopted the "product test" which was pioneered in New Hampshire nearly a century ago,[4] this court's opinion undertook to explain, even if very briefly, the basis for adopting the New Hampshire doctrine. The summary paragraph of the Durham opinion is of critical importance for it purports to tell us what underlies the holding:

> "the legal and moral traditions of the western world require that those

who, *of their own free will* and with evil intent * * * commit acts which violate the law, *shall be criminally responsible* for those acts. Our traditions also require that where such acts stem from and are the product of a mental disease or defect as those terms are used herein, moral blame shall not attach, and hence there will not be criminal responsibility. The rule we state in this opinion is designed to meet *these requirements."* (Emphasis added.) (Footnote omitted.)

The product test thus, by its terms at least, was "designed to meet" *two* requirements, first that an accused is to be held criminally responsible if of his "own free will" and with evil intent he "commits acts in violation of law," and second, and conversely, that if his act was the product of mental disease he is not responsible. Each of these propositions is obviously a different side of the same coin. The first tells who is held, the second tells who is excused. To me the clear and inescapable meaning of these *two* requirements, when considered together, is that punishment is imposed only for a wilful and knowing act which must mean it is one intentionally done and which could have been restrained by the accused. Punishment is not imposed for a disease-produced act because if it is a "product" of disease then the disease has eliminated the faculties which enable him to know what he is doing and which enable him to regulate his behavior. A mental disease can be thought to "produce" a criminal act only if it affects the defendant's understanding or his power to control his acts. If disease does not prevent him from exercising these faculties, it cannot reasonably be said to "produce" the act. See Carter v. United States, 102 U.S. App.D.C. at 235, 252 F.2d at 616. Until now I had understood that all members of this court agreed that mental disease alone *does not* excuse one for his

---

3. Carter v. United States, 102 U.S.App. D.C. 227, 237, 252 F.2d 608, 618 (1957).

4. State v. Pike, 49 N.H. 399, 402 (1869–70).

acts in violation of law. "The law has no separate concept of a legally acceptable ailment which *per se* excuses the sufferer from criminal liability." Carter v. United States, 102 U.S.App.D.C. at 236, 252 F.2d at 617.[5]

So much difficulty was experienced by the District Courts and by us in the application of the product test because of the inherent ambiguity of the word *product* and the uncertainty of the meaning of the term *disease,* that in 1957 in the Carter case, supra, we tried to clarify what the product test meant and how it was to be explained to the jury. The language of that case plainly indicates that Judge Prettyman did not regard the product test as altering the basic, underlying concepts of the criminal law:

> "the basic postulate of our criminal law * * * [is] 'a free agent confronted with a choice between doing right and doing wrong and choosing freely to do wrong.' * * * An insane man is not held responsible, because he has not a criminal mind in respect to the act he committed. *That philosophy has never changed, and it is not proposed to change it now.*" (Emphasis added.) (Footnotes omitted.) 102 U.S.App.D.C. at 235, 252 F.2d at 616.

Plainly we were reasserting that the concept of free will and capacity for choice and control enunciated by Pound, Justice Cardozo and Justice Jackson[6] was the basis of our rule. Later, in Douglas v. United States, 99 U.S.App. D.C. 232, 239 F.2d 52 (1956), this court said:

> "In aid of such a determination [whether the act charged was a product of a mental disease] the court may permit the jury to consider whether the accused understood the nature of what he was doing *and whether or not his actions were due to a failure, because of mental disease or defect, properly to control his conduct."* (Emphasis added.)

This was nothing more or less than saying that only if the mental disease disabled the accused from properly controlling his conduct could the conduct be regarded as a *product* of the disease. The inescapable corollary of this is that if he could have controlled his conduct and refrained from doing the act then it was *not* a product of mental disease. The one proposition, I repeat, is the corollary of the other.

In light of these utterances, approved by a majority of the entire court over a period of eight years, it is little wonder that the District Judge thought we had authorized him to say to the jury essentially what he did say.

We must look at the portion of the charge described by the majority as "patently erroneous"; the District Judge said:

> "In other words, *and by way of example:* If, because of some abnormal mental condition the defendant had an impulse to rob which he could not control, then it may be said that the mental disease produced the act but if he could have controlled it and refrained from doing the act, then his will must have assented to the act, and it was not caused by the disease, but by the concurrence of his will and he was therefore responsible for his act." (Footnote omitted.)[7]

---

5. The Durham opinion states: "Thus your task would not be completed upon finding, if you did find, that the accused suffered from a mental disease or defect. He would *still be responsible* for his unlawful act if there was *no causal* connection between such mental abnormality and the act." 94 U.S.App.D.C. 241, 214 F.2d at 875. (Emphasis added.)

6. Charles C. Steward Machine Co. v. Davis, 301 U.S. 548, 590, 57 S.Ct. 883, 81 L.Ed. 1279 (1937); Gregg Cartage & Storage Co. v. United States, 316 U.S. 74, 79–80, 62 S.Ct. 932, 86 L.Ed. 1283 (1942); Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

7. This charge is taken almost verbatim from State v. Jones, 50 N.H. 369, 399

The majority says this charge is "patently erroneous" because "it may well have led the jury to believe that capacity to refrain from doing the act was the overriding determinant of criminal responsibility." But we should note first that the District Judge explicitly introduced the capacity for control discussion merely "by way of example," to illustrate the meaning of the product test as we had urged should be done in the Carter opinion. Secondly the capacity for control comments were but a part of the total charge which mentioned the product of disease standard at least seven times. Most important of all, what can be "patently erroneous" about telling the jury that if the defendant "could have controlled an impulse to rob" he should be held criminally responsible? The majority view appears to be that an act can be the product of disease even though the defendant could have controlled it by the exercise of will. This simply is not correct.

What the majority seems to overlook is that a disease-produced act and an act of "free will and with evil intent," (which is simply a way to describe a controllable act) are mutually exclusive by the precise language used in the Durham, Douglas and Carter cases. If the robbery was a product of a disease then it was an "uncontrollable act"; if he *could have* controlled it then it was not produced by disease. There is no "third category."[8] I suggest that what the majority is really driving at is to preclude *any* explanation of the product test in terms of capacity for control of conduct. This, as I pointed out in Blocker v. United States, 110 U.S.App.D.C. 41, 288 F.2d 853 (1961), is the essence of the problem. The difference between the majority view and mine is more than a matter of semantics; the difference is one as to the fundamentals which guide us in deciding what kinds of unlawful acts ought to be excused.

The precise words to be used by the District Judge are not too important so long as the charge conveys an explanation of the product test in terms that make clear it is directed to exculpating: (a) those who do not understand *what* they are doing, (b) those who do not understand the *unlawfulness* of what they are doing, and (c) those who cannot *control* their conduct even when they know it to be unlawful. Any instruction which embraces these concepts is satisfactory whatever words are used to describe or explain.

In addition to our own recent cases the case of Hotema v. United States, 186 U.S. 413, 416–417, 22 S.Ct. 895, 46 L.Ed. 1225 (1902), supports this approach. There the Supreme Court approved as "undoubtedly correct" a charge which told the jury that for a mental disease to excuse the defendant it "must have been *sufficiently great* to have *controlled the will* of the accused at the time of the commission of the act." The approved charge also explained that the homicide was to be regarded as "the product of

(1871), in which the authors of the original disease-product test approved a charge which explained the test in terms of capacity for control:

"If he could have controlled [the act charged], then his will must have assented to the act, and it was not caused by the disease, but by the concurrence of his will, and was therefore crime."

8. Judges Bazelon and Washington state at page 602 that "Durham encompasses consideration" of "whether * * * the accused had the 'capacity' to refrain from the act" in determining (1) the existence of mental disease and (2) a causal connection between the disease and the act, but "it [Durham] ends the inquiry once

(1) and (2) [disease and causality] are established." (Emphasis added.) This clearly implies that from their point of view mental disease and causality may be found to exist *despite* concurrent proof that the defendant had capacity to refrain from doing the act. In their view the jury may find an act is the product of disease even though the defendant had capacity to control his act! This would be a clear repudiation of everything this court has uttered on the subject of free will and criminal responsibility. They do not want the "product" concept to be tested by an explanation that if the act could have been controlled it could not be the product of mental disease.

such disease * * * [if] he [defendant] was incapable of forming a criminal intent, and * * * had no control of his mental faculties and the will power to control his actions."

If these "basic postulates" are agreed on, as I thought they were in the three principal cases discussed, how can it be said that the jury should not be told that if Campbell could have controlled his urge to rob but failed to do so then the act was not caused by the disease and he was responsible? In addition to being almost a verbatim reproduction of the charge in State v. Jones, supra note 7, the charge now held to be "patently erroneous" is essentially the same as that appearing in Parsons v. State, 81 Ala. 577, 2 So. 854 (1887) and in Hotema v. United States, supra.

As a general statement of objective no one can have a serious quarrel with the proposition that if an unlawful act is the product of mental disease punishment should not attach. But to give this combination of labels to a jury of laymen as a standard to measure criminal responsibility with no guiding explanation that they are to decide whether the disease destroyed the defendant's capacity to understand what he was doing or his capacity to control his conduct, reduces the whole business to verbal formalism.

Judges Bazelon and Washington give us an excellent example of the tyranny of labels from which they would seek to deny any deviation. I submit they are not free to deny explanation in the broad terms laid down in our own cases previously discussed. Those prior opinions of this court fully warrant the District Court to explain the meaning of the product test in the following terms, so long as the product test itself is first given as the basic standard together with explanation of the burden of proof under the Davis and Durham cases:

1. When we say that you are to decide whether the act charged is or is not the product of a mental disease we mean that the question is whether the disease made the effective or decisive difference between doing and not doing the act. The existence of mental disease, standing alone, does not excuse the defendant. There must be a relationship between the disease and the act and that relationship must be critical in its effect in relation to the act. By that we mean the relationship between the disease and the act must be decisive, determinative, and causal in the sense that but for or except for the disease the act would not have been committed.

2. To understand the issue of insanity, or mental disease or defect, in a criminal case the jury must bear in mind that the law punishes only a person who is a free agent confronted with a choice between doing right and doing wrong and choosing freely to do wrong.

3. When we exculpate an "insane" person it is because he does not have a criminal mind or vicious intent in respect to the act he committed. This is but another way of saying that he lacks the essential mental capacity to form the intent or that he lacks the capacity properly to control his conduct because of mental disease or defect. However, it is also a requirement of the law that those who of their own free will and with evil intent commit acts which violate the law shall be criminally responsible for those acts.

4. In deciding whether the act charged in a given case is the product of mental disease or defect, the jury may consider whether the defendant understood the nature of what he was doing and whether or not his actions were due to a failure, because of a mental disease or defect, properly to control his actions. If mental disease disabled him from controlling his conduct then the act is the product of mental disease and he is not responsible for his act; on the other hand if he could have controlled his acts and refrained from doing the act charged then mental disease did not disable him and he is responsible.

The most cursory examination of these four points will disclose that they are taken directly or by paraphrase from the Durham, Carter and Douglas opinions and Hotema v. United States, supra.

(2)

*Emotional Unstable Personality Now A Mental Disease*

The second phase of this case relates to the expansion of the meaning of mental disease to include yet another concept which was not considered a "mental disease" when the product test was adopted in 1954. As in the prior instance when "psychopathic personality" was added to the list of "insanities," we are left totally uninformed as to any scientific basis for the change. It is not suggested that any medical discovery or recent scientific revelation accepted generally by psychiatrists warrants this change in the "administrative" policy which has such far reaching impact on the administration of criminal law.

The expert in this case, Dr. Owens, a regular staff member of St. Elizabeths Hospital testified:

"A. In my opinion, he was suffering from what is classed as an emotionally unstable personality, which, in my opinion, is a mental disease.

" * * * this individual was extremely emotional. He reacted to minor stress and with a major emotional reaction. * * * He was quite tense and anxious, perspiring profusely."

In answer to a question Dr. Owens stated that it would be correct to say that there are "a lot of emotionally unstable people walking around the street." Dr. Owens saw this patient only briefly on a few occasions, could not state when his interviews were held or for how long and had no notes of his interviews. There was no evidence of hallucinations, delusions, ideas of persecution nor evidence of psychosis. The majority opinion seems to recognize that this evidence hardly makes out a strong case of serious mental illness.

Since this is the first time a case has come to us with the claim that a defendant with an "emotionally unstable personality" is legally "insane" and therefore not responsible for his unlawful acts, the process by which the expert witnesses change their opinions on what is or is not a "mental disease" is of importance. A description of the process is reproduced in the margin taken from the testimony of the defense expert in this case.[9] This

9. "Q. Now, how long has this diagnosis of emotionally unstable personality been considered a mental disease at St. Elizabeths Hospital?

"A. Administratively the hospital has considered this a mental disease since November, 1957.

"Q. Well, in other words as far as St. Elizabeths was concerned, before November 1957, administratively an emotionally unstable personality diagnosis wasn't a mental disease; is that right? A. That's correct.

"Q. And the same may be said of this line of questions that Mr. Mathews was asking you about these sociopathic personalities. They weren't always considered as having a mental disease by St. Elizabeths, were they, Doctor? A. That's correct.

"Q. When did St. Elizabeths decide that sociopathic personalities had a mental disease? A. Well, administratively they began to be recorded as suffering from a mental disease in November, 1957.

"Q. Now, when you say 'administratively,' what do you mean by that, Doctor? A. Well, what I mean is that this was not a decision of sudden change in the hospital policy to class people—patients suffering from sociopathic personality or any type of personality disorder, as being suffering from mental disease in November [1957], that in October they were not suffering from a mental disease.

* * * * *

"Q. Well now— A. And prior to this time there'd been probably a considerable amount of thinking among the psychiatrists as to whether these conditions were mentally ill, and finally, in 1957, the point had been reached where the *majority* of the physicians felt that this was a mental disease and should be so classified. (Emphasis added.)

"Q. Now, who over there had the final determination to say that as of November, whatever it was, 1957, emotionally unstable personality is a mental disease? A. Well, as I said, this was left a mat-

change of course parallels the "weekend" change which converted psychopaths or sociopaths from a non-mental disease to a mental disease category.[10] As has been suggested, if this "administrative" definition was for purposes of the "hospital for clinical and professional purposes of psychiatrists and their aides" it would be of no concern to the law. But these changes in definition resolve, to a large extent, whether a person guilty of unlawful acts is to be excused. Cf. Blocker v. United States, 110 U.S.App. D.C. at 49, 288 F.2d at 861. No one has ever advanced a suggestion that psychiatric treatment of psychopaths was any different after they achieved the new status in 1957 as persons with "mental disease." The only change we are aware of is that after November, 1957, they became prima facie exculpable for their unlawful acts. This would suggest the possibility that the change in labels had no medical significance but only legal significance.

If we accept the notion, as the majority opinion does, that a person with an "emotionally unstable personality" is "insane" or has a "mental disease," certain consequences may well follow. Does it mean if a defendant takes the stand and states "I've always been emotionally unstable" that the burden of proof requirements of Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895), are invoked and that the Durham instruction must be given?[11] In other words, must the prosecution then prove, beyond a reasonable doubt, either that the defendant was *not* emotionally unstable, or if he was, that the act charged was *not* the "product" of his emotionally unstable condition? While I am far from ready to accept the idea that all criminals are "insane," I can see some validity in the suggestion that a great many crimes are related in some way to an emotional instability of the actor. How would a prosecutor prove beyond a reasonable doubt that a crime of violence, such as a rape, is unrelated to emotional instability? Does the majority seek a standard of criminal responsibility under which the prosecution cannot meet its burden in any case? Their holding is, I suggest, a long step in the direction of substituting the determinist philosophy for the belief expressed by Justice Cardozo that all law in Western civilization is "guided by a robust common sense which assumes the freedom of the will as a working hypothesis in the

---

ter of each individual doctor's opinion. However, administratively, only the superintendent could change the policy of the Hospital, and it occurred in November 1957.

"Q. Well, in other words, as I understand you then, a determination was made in November of '57 by the then superintendent of St. Elizabeths Hospital that administratively, for hospital purposes, someone who had an emotionally unstable personality had a mental disease? A. That's correct, and they would be so recorded as having a mental disease."

10. The background of the "conversion" of the psychopath may well be recalled: See Rosenfield v. Overholser, supra note 1. To the psychiatrist at St. Elizabeths Hospital the term "psychopath" or its newer synonym "sociopath" is a person "who is ill in the terms of society [because his behavior is] not in keeping with the laws and the rules and regulations of the community or society in which he lives." Tr. 58.

The sociopath is considered to have a mental disease not by reason of observable or recognized *medical* symptoms but rather because his actions are anti-social, i. e., he is a law breaker. Normal people, they seem to reason, do not break laws, hence law breakers are not normal. They are "insane" not by *medical* but by *social* standards. They are "insane" because they break the law and they break the law because they are "insane"! This peculiar circular logic, carried full circle, would if accepted by lay jurors require virtually every defendant to be acquitted.

11. See Tatum v. United States, 101 U.S. App.D.C. 373, 249 F.2d 129 (1957); Clark v. United States, 104 U.S.App.D.C. 27, 259 F.2d 184 (1958). These cases would seem to suggest such "evidence" invokes the Davis burden and the Durham instruction.

solution of [legal] problems.[12] The majority's uncritical acceptance of whatever definition of mental disease is advanced by an expert is the sort of development Harvard's Professor Berman was perhaps condemning when he said:

> "The lawyers in all countries will answer 'if there is no reason, no choice, no will, then there can be no law; we will not sacrifice the legal order to the vagaries of your science.' Berman, Law as an Instrument of Mental Health, 109 U.Pa.L. Rev. 361, 366 (1961)."

If this is a correct analysis as to where this holding could lead us then indeed a defendant may well be able to dispense with the experts and rely on friends, relatives and his own testimony to show that he sometimes exhibited the following symptoms: was "extremely emotional," "tense and anxious," "perspired profusely," reacted "with excitability," demonstrated "poor judgment," had "difficulty in his relationships with the people around him." These symptoms, we must remember, are what the majority opinion accepts from the defense expert (who in turn accepted them from the defendant) as *the evidence* which shifts to the prosecution the burden of proving that the act was *not* the product of the sum of these "abnormalities." These abnormalities are equated to "emotionally unstable personality," which in turn has now become a "mental disease." On another occasion I suggested that we had taken the determination of this kind of case away from the jury and given it to the experts. The majority holding here tends to take it away from both jury and experts and put it in the hands of the defendant.

———

In summary I emphasize again that the three courts other than ours which have employed the "disease-product" test going back nearly 100 years have explained the test in almost exactly the terms used by the District Judge in this case, i. e., whether the defendant was able to control his conduct and refrain from doing the act.[13] Without this kind of explanation the product test well merits the criticism placed on it by eminent scholars and psychiatrists that it is "vague," "ambiguous," "beclouded," "confusing," "misleading." [14] It is this want of concrete explanation which led three members of this court to urge such a modification of our rule in separate concurring and dissenting opinions in Blocker v. United States, supra. If our *disease-product* test means what Judges Bazelon and Washington now say it means, then I suggest they—rather than the critics of that test—have made out the best case for changing it. The change can be accomplished by an explanation such as used by the New Hampshire, Alabama and the United States Supreme Courts in the cases mentioned.[13] Such an explanation will be equivalent to overruling Durham as the majority has construed and applied it. Either step will accomplish the necessary result and either step will permit as wide if indeed

---

12. Charles C. Steward Machine Co. v. Davis, 301 U.S. 548, 590, 57 S.Ct. 883, 81 L.Ed. 1279 (1937).

13. The United States Supreme Court (1902) in Hotema v. United States, supra; New Hampshire (1871) in State v. Jones, supra; Alabama (1887) in Parsons v. State, supra.

14. Wechsler, The Criteria of Criminal Responsibility, 22 U.Chi.L.Rev. 367, 373 (1955); deGracia, The Distinction of Being Mad, 22 U.Chi.L.Rev. 339, 342 (1955); Mueller, 1959 Ann.Survey Am.L. 112–114; Judge L. Hand, 22 U.Chi.L.Rev. 319 (1955); Reid, Understanding The New Hampshire Doctrine of Criminal Insanity, 69 Yale L.J. 367, 371, 389–91 (1960); Dr. T. S. Szasz, Psychiatry, Ethics, and the Criminal Law, 58 Colum. L.Rev. 183, 190 (1958); Dr. C. Savage, Discussion, 116 Am.J. of Psychiatry 295, 296 (1959); Dr. J. R. Cavanagh, A Psychiatrist Looks At The Durham Decision, 5 Catholic U.L.Rev. 25, 28, 30 (1955); Dr. Philip Q. Roche, The Criminal Mind (1958) at 25, 257–58; Dr. Philip Q. Roche, Durham And The Problem of Communication, 29 Temp.L.Q. 264, 269 (1956). See also United States v. Currens, 290 F.2d 751 (3d Cir. 1961).

not a wider scope for psychiatric testimony than is permitted now.

The majority holding, construing the product test as it does, makes it quite plain to me that we have laid aside what Judge Thurman Arnold called "the age old conceptions of individual moral responsibility," [15] although since 1954 we have solemnly held out the facade of adherence to those principles. Perhaps we have paved our route with the best of intentions, but in the actual application of our standard we have departed from the basic postulate that in a criminal case the inquiry into mental capacity is only to determine whether the defendant possessed the capacity, power, ability—whatever we call it—to form the indispensable criminal or "evil intent." This cerebral, mental, or intellectual element is the critical factor without which the overt physical act, even though unlawful, is not a crime. I would affirm.

Addendum to dissenting opinion of Circuit Judge BURGER filed March 29, 1962 [*]

BURGER, Circuit Judge (dissenting).

(1)

Since the majority of the sitting division commands a new trial with a different instruction from that given by Judge HART, I propose to fill a vacuum, which has long existed, in the form of a proposed jury charge on criminal responsibility which will implement and explain the "product test" in the terms we have pointed out from time to time. This proposed charge is appended as an appendix to my opinion.[1] Every element in the proposed charge comes from opinions of this court. It is not suggested, of course, that this is the only correct form a charge could take. Nor does it embrace all the various forms of explanation which could properly be given under Carter v. United States, supra. A unanimous division of the court in Carter v. United States outlined some of the concepts which could properly be used by the District Judges in charging a jury under our existing rule. Since those suggestions have never been challenged by any member of this court, the opinion of a single judge drawing attention to those concepts, while not binding on anyone has, I submit, the same standing as the source of that material, i. e., Durham v. United States, supra; Carter v. United States, supra. See also Douglas v. United States, 99 U.S.App.D.C. 232, 239 F.2d 52 (1956). The utterance of the court obviously controls over the interpretation given by any one judge.

(2)

The change in classification of Campbell's disease by administrative fiat calls for more inquiry than has been given to it. *Why* the change was made has never been explained except we now know that a patient with the "disease" of "emotionally unstable personality" or a "psychopathic (sociopathic) personality disorder" receives the same treatment or therapy as before the change in classification. Thus there was no *medical* significance or consequence to this "administrative [name] change." But there was an enormous *legal* consequence as I have pointed out for now the showing of one of these newly classified "diseases"

15. Fisher v. United States, 80 U.S.App. D.C. 96, 97, 149 F.2d 28, 29 (1945). See Dusky v. United States, 295 F.2d 743 (8th Cir. 1961).

* [The opinion of a division of the court (Circuit Judges BAZELON, WASHINGTON and BURGER) was announced March 29, 1962. Thereafter the United States moved for rehearing *en banc* and the parties filed memoranda in support and in opposition. An order denying rehearing *en banc* for want of five affirmative votes was entered June 12, 1962.

Chief Judge WILBUR K. MILLER and Circuit Judges DANAHER, BASTIAN and BURGER voted for rehearing *en banc*.]

1. Were it possible to do so, my individual choice would be to make a fresh start and adopt the standard developed by the American Law Institute in its Model Penal Code. However, if explained in the terms outlined in the Appendix, our standard would not differ greatly from the American Law Institute test in actual operation.

places on the government the burden of proving beyond a reasonable doubt that the act charged was *not* a "product" of this new "disease."

By the action in "administratively" changing classification of various abnormal mental conditions and classifying them as "mental diseases" as in In re Rosenfield, D.C., 157 F.Supp. 18 (1957), and in this case, with no revealed purpose or consequence except a *legal* consequence, the St. Elizabeths' psychiatrists who permit their medical opinions to be dictated by "administrative" fiat or by majority vote or by any other non-scientific process have opened themselves to the dual charges of abandoning medical concepts and usurping judicial functions in order to bring about acquittals which they or their superiors consider appropriate. It is not a legitimate function of psychiatry to change its "labels" for the purpose of bringing the maximum number of defendants under the protective umbrella of any particular legal test.

### (3)

This process of changing non-disease conditions into diseases by some administrative or parliamentary process underscores what was indicated in the concurring opinion in Blocker v. United States, supra. A jury ought to be told plainly that they *alone* are to determine whether in fact a "mental disease" exists because that is an issue of fact and while they must decide this under the evidence they are *not bound* to accept the classification of a particular condition as a "disease" by an expert witness. Jurors are the sole and final judges of the credibility of all witnesses including experts. If they do not believe a witness they are free to reject his testimony; of course the jury should also be told that they cannot reject it arbitrarily and without reason.

### (4)

It is axiomatic that the trial judge has broad judicial discretion as to how far an expert witness may go in expressing a technical opinion in terms similar to the question the jury must decide. When it is asked in terms the same or substantially the same as the ultimate issue which the jury must decide the trial judge is bound to scrutinize the testimony closely. See discussion, Blocker v. United States, concurring opinion, 110 U.S.App.D.C. at 50–52, 288 F.2d at 862–864. In that opinion three members of this court called attention pointedly to the explicit holding of the United States Supreme Court in United States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617 (1935). There the Court held:

> "Clearly the experts failed to give proper weight to his fitness for naval air service or to the work he performed, and misinterpreted 'total permanent disability' as used in the policy and statute authorizing the insurance. Moreover, that question *is not to be resolved by opinion evidence. It was the ultimate issue to be decided by the jury* upon all the evidence in obedience to the judge's instructions as to the meaning of the crucial phrase, and other questions of law. The experts *ought not to have been asked or allowed to state their conclusions* on the whole case. \* \* \*" 293 U.S. at 506, 55 S.Ct. at 277. (Emphasis added.)

See also Simmons v. United States, 92 U.S.App.D.C. 122, 206 F.2d 427 (1953).[2]

---

2. The Simmons case is of particular interest. There, although the appellant had not preserved the point by objection, we held it was "plain error" to allow a police detective of the gambling detail to testify in "conclusion terms" that the conduct of the defendants "fitted right into my knowledge of how numbers men operated." Judge Bazelon, writing for a unanimous division (Bazelon, Fahy and Washington)

held: "Such opinion evidence trenched upon the jury's duty to determine *the ultimate question* raised by count one, *i. e.,* whether appellant was operating a numbers game \* \* \*. It was *for the jury* not for the witnesses, *to measure evidence* on appellant's conduct \* \* \*." 92 U.S. App.D.C. at 124, 206 F.2d at 430. (Emphasis added.)

In a number of cases in this court appellants have protested the "trial by label" especially the practice of allowing a psychiatrist to tell the jury that the defendant's act, for which he is on trial, is *not* the "product" of mental disease. The reason for this is obvious: when a qualified expert psychiatrist with the mantle of professional standing, and medical degrees in a high calling, tells a jury that the act charged is *not* the "product" of any "mental disease" he is stating a conclusion *that the defendant ought to be found guilty*.[3] As I view it, no witness, expert or otherwise, should ever be allowed to state that conclusion to a jury. It would appear the Supreme Court is of the same view.

It is interesting to note that in adopting the 1869 New Hampshire product test this court seems to have anticipated that a "conclusion" opinion on "product" *would not* be admissible. The Durham opinion states:

> "The questions of fact under the test we now lay down are as capable of determination by the jury *as, for example, the questions juries must determine upon a claim of total disability under a policy of insurance* where the state of medical knowledge concerning the disease involved, and its effects, is obscure or in conflict. In such cases, the jury is not required to depend on arbitrarily selected "symptoms, phases or manifestations" of the disease as criteria for determining the ultimate questions of fact upon which the claim depends. Similarly, upon a claim of criminal irresponsibility, the jury will not be required to rely on such symptoms as criteria for determining the ultimate question of fact upon which such claim depends. Testimony as to such "symptoms, phases or manifestations,"

along with other relevant evidence, will go to the jury upon *the ultimate questions of fact which it alone* can finally determine. * * *" 94 U.S.App.D.C. at 242, 214 F.2d at 875–876 (Footnote omitted.) (Emphasis added.)

United States v. Spaulding, of course, involved the precise "ultimate issue" envisaged in the Durham opinion. If we are commanded by the Supreme Court to exclude that precise peremptory expert conclusion in a *civil* case it is more obviously objectionable in a criminal case. The *negative* answer is bound to be very damaging to an accused. I find it difficult to see why United States v. Spaulding is not binding on the District Court and this court and why it has not been enforced.

I suggest also that if contending counsel and the psychiatrists are forbidden to take the "easy way" by testifying on the causal connection in terms of "product" this very fact will *compel* compliance with our unanimous opinion in Carter where Judge Prettyman said:

> "The chief value of an expert's testimony in this field, as in all other fields, rests upon the material from which his opinion is fashioned and the reasoning by which he progresses from his material to his conclusion; in the explanation of the disease and its dynamics, that is, how it occurred, developed, and affected the mental and emotional processes of the defendant; it does not lie in his mere expression of conclusion. The ultimate inferences *vel non* of relationship, of cause and effect, are for the trier of the facts.
>
> "Durham was intended to restrict to their proper medical function the part played by the medical experts. Many psychiatrists had come to understand there was a "legal insan-

---

3. It is a mystery to me that psychiatrists, who object bitterly to answering whether a defendant knew his actions were wrong, are quite willing, indeed eager, to testify in terms of "product" or "no product" which in context means, if it means any-

thing, the expert's opinion on whether the defendant should be found not guilty by reason of insanity or found guilty. Psychiatrists should not be permitted to testify in terms of "right," "wrong" or "product."

ity" different from any clinical mental illness. That of course was not true in a juridicial sense. The law has no separate concept of a legally acceptable ailment which *per se* excuses the sufferer from criminal liability. * * *" 102 U.S.App.D.C. at 236, 252 F.2d at 617.

The pernicious practice of allowing the conclusion opinions on "prcduct" by experts, apart from its other vices, has operated to *narrow* and constrict the scope of psychiatric testimony when what we want is to *broaden* that scope. See Frigillana v. United States, 113 U.S.App.D.C. ——, 307 F.2d 665. The function of the psychiatrist is not to try to tell the jurors what verdict they should render but rather to portray, as fully and completely as possible, the mental and emotional make-up of the defendant, how his emotional and intellectual processes work and how they affected his capacity to control his conduct, both generally and in the specific situation surrounding the crime charged. They should try to portray the "inner man" as best they can without fanciful speculation. The opinions must be based on "reasonable medical certainty" which has always been the legal standard for expert medical opinions. The experts cannot be expected to know all these answers as to every defendant but these are the areas in which they should be examined and cross-examined extensively. Only by doing this can we avoid the sterile, atrophying process of letting these trials continue to be contests of labels in which the prosecution strains to get at least one expert to say "no disease" or "no product" and defense strains for the opposing labels. The natural tendency of advocates is to stop as soon as they have made a record which will assure that they will get to the jury—or get a directed verdict. The ultimate responsibility—and power—to prevent witnesses from violating rules of evidence lies with judges.

### (5)

A diagnosis of the defendant's condition, while involving conclusions of a kind, is admissible, even though a jury is not bound by a diagnosis or a particular diagnostic label on a mental disorder. The jury wants and needs help from the expert, but it does not help a jury of laymen to be told of a diagnosis limited to the esoteric and swiftly changing vocabulary of psychiatry. Every technical description ought to be "translated" in terms of "what I mean by this," followed by a down-to-earth concrete explanation in terms which convey meaning to laymen. A psychiatrist who gives a jury a diagnosis, for example, of "psychoneurotic reaction, obsessive compulsive type" and fails to explain fully what this means, would contribute more to society if he were permitted to stay at his hospital post taking care of patients.

A psychiatrist may also describe the connection, if he is able to do so, between the mental disease and the act charged without labelling it a "product" or not a "product." This is the phase of inquiry which should be the subject of the most comprehensive examination and cross-examination. One or the other of these searching devices ought to be adequate to reveal the relevant basic material or the flaws and fallacies of the expert's position. We have explicitly, but with dubious wisdom, preserved the McNaghten and Irresistible Impulse test in this jurisdiction. Few things can be plainer than the fundamental similarity of the Irresistible Impulse test and the inquiry into whether the defendant possessed capacity to control his conduct, or in the words of the American Law Institute test "to conform his conduct to the requirements of the law." See also excellent opinion of Chief Judge Biggs in United States v. Currens, 290 F.2d 751 (3d Cir. 1961). If direct examination does not deal with capacity for control of conduct that is no bar to exploring it by way of cross-examination for it is one of many permissible ways to test the opinion of the witness.

It is at this point where trial counsel's responsibility comes into play. It is for him to elicit, either by direct or cross-examination, "the material from which

[the psychiatric] opinion is fashioned" and the steps by which the raw material of the tests, observations and other data led to the diagnosis and opinion. The value of an expert opinion can rise no higher than the facts and premises on which it is based. But it is only a rare medical witness who is so skilled in the forensic art that he can present testimony adequately even where there is inept interrogation by counsel. If trial counsel fail in their role the trial judge would be well advised to urge them, out of the presence of the jury, to explore and develop the subject so that the witness can translate all of his medical observations to the jury. This is the area in which the deterioration if not breakdown of the trials of these "insanity" cases is to a large extent the fault of the trial counsel. If lawyers want the views of the experts to be accepted by lay jurors their first duty is to draw out expert testimony in terms which are intelligible and meaningful.

Lest these comments be taken as undue criticism of psychiatrists I emphasize again the obvious fact that in the courtroom the psychiatrist is largely at the mercy of trial counsel. Moreover, this court must share responsibility for what has been taking place since we have, for eight years, failed to insist on adherence to United States v. Spaulding, supra. It is ultimately our responsibility to prevent these trials from deteriorating into "trial by label" or "trial by psychiatrist," and District Judges can take the first step by precluding conclusion opinions on the product aspect under the plain mandate of the Spaulding and Simmons cases, supra.

Of more than incidental interest and as a "footnote to history," it is a curious thing that while our Durham opinion derided the McNaghten test as obsolete, both McNaghten and the 1869 New Hampshire "product" test, which we adopted verbatim, were inspired directly by the ideas and writings of Dr. Isaac Ray.[4] Our Durham opinion made the fairly common error of equating the McNaghten test with the ancient "right-wrong test" which McNaghten superseded. See Durham v. United States, 94 U.S.App.D.C. at 235–236, 214 F.2d at 869–870. The very purpose of the McNaghten hearing in the House of Lords was to inquire into the *rejection* of the old ecclesiastically oriented right-wrong test and adoption of the new and *medically* oriented test of whether the "accused was labouring under such a * * * disease of the mind as not to know the nature and quality of the act [charged], or, if he did * * * that he did not know [it] was wrong." 10 Cl. and F. 200, 210, 8 Eng.Rep. 718, 722 (1843). The word "right" does not appear in the McNaghten test and the word "wrong" in context plainly means unlawful rather than morally reprehensible only.

Paradoxically, the rule we derided as "obsolete" and the "modern" rule we adopted verbatim from New Hampshire were both based upon mid-19th century concepts of psychiatry—chiefly those of Dr. Ray. The McNaghten test, without more, is indeed obsolete but in the same sense that the "product" test is obsolete. Each is deficient because each keeps from the jury the 20th century developments of the behavioral disciplines—the dynamics of human behavior, capacity for control and regulation of behavior, and the factors relating to that control.

That the product test is based upon psychiatric concepts of 100 years ago is of no real importance except as it relates to the claim of some that it is the only test compatible with modern psychiatry. More important is the fact that when we adopted the 1869 product test, without a word in the jury charge as to any connection between the product test and the matter of intent or *mens rea,* we broke with all legal and moral tradition. From the beginning of the Christian Era and from the Talmud of the ancient Hebrews the idea of intent in rela-

---

4. See Reid, Understanding the New Hampshire Doctrine of Criminal Responsibility, 69 Yale L.J. 367 (1960).

tion to act, or *mens rea*, has been the controlling doctrine of Western Civilization and the basic postulate of its law. Without this there can be little but chaos and confusion in the law. Plainly the idea of *mens rea* is not in conflict with psychiatry, as advocates of the product concept seem to think, for like psychiatry the law of *mens rea* is centered not on the *act* but upon the *actor* and upon his capacity to regulate his behavior or control his conduct. The behavioral disciplines, I repeat, are constructed on the same basic factors as the ancient rule of *mens rea*—the "why" and the "how" of human behavior and elements relating to its control and regulation.

The legal system as it is now constituted cannot function under a rule like the "product" test unexplained which tends to excuse the unlawful acts if the actor is mentally disturbed or emotionally unstable. Under our present system Society can excuse the unlawful act only if mental disease is of such kind and degree and has such impact that the actor is substantially disabled from exercising control over his acts. Explained in these terms, as we urged in Blocker v. United States, supra, it may work and overcome the shortcomings of the McNaghten test.

## APPENDIX

### (Suggested form of instruction)

The defendant makes the claim in this case that he is not guilty by reason of insanity. The law governing your deliberations is that a person who, of his own free will and with evil or vicious intent, commits an act which violates the law, is criminally responsible for that act. The law also provides that where the act charged stems from and is the product of mental disease or defect, moral blame shall not attach and hence there is no criminal responsibility. In other words, the defendant is not criminally responsible if his unlawful act was the product of mental disease or mental defect. Durham v. United States, 94 U.S.App.D.C. 228, 242, 214 F.2d 862, 876 (1954).

Under the law every man is presumed sane, that is to say he is presumed to have no mental disease or defect, and is responsible for his acts. But that presumption no longer prevails when some evidence develops that he may not be sane or that he may have a mental disease or defect. The defendant is not required to prove he is "insane" or that he has a mental disease or defect. To raise the issue of mental competence to form criminal intent he need only indicate by some evidence that his sanity or mental capacity is in doubt. Davis v. United States, 160 U.S. 469, 486, 16 S.Ct. 353, 40 L.Ed. 499 (1895).

When he has put that issue in question, as he has here, the mental condition of the defendant then becomes a critical element in the case and the government must then prove beyond a reasonable doubt that the defendant had no mental disease or defect, or if he did, that the act was not the product of the disease or defect. To put it in another way the government must then prove, beyond a reasonable doubt, that the defendant committed the act charged of his own free will and with evil or vicious intent. Durham v. United States, 94 U.S.App.D.C. at 241–242, 214 F.2d at 875–876. If by reason of mental disease or defect he was substantially disabled from controlling his conduct then the act can be said to be the product of his abnormal mental condition. But if he had substantial capacity to control his conduct and refrain from doing the act charged then you are free to find the act was not the product of disease.

The terms mental disease and mental defect as the law uses them are broad terms by which we intend to describe any abnormal mental condition which substantially impairs mental or emotional processes of the defendant to the point where it substantially or seriously disturbs the conduct or behavior of the defendant or his ability to control his conduct or behavior. It will be your responsibility to decide whether the testimony in this case, as a whole, discloses the ab-

sence of a mental disease or defect under this broad definition. You may not reject or disbelieve testimony arbitrarily or capriciously but only for some reason such as you would act upon in the important affairs of your own daily life. In reaching your decision on the question of mental disease or mental defect you are to give such weight and credit as you consider appropriate to the testimony of the witnesses who testify on the subject, including both laymen and experts, bearing in mind as to the experts their special education, training and experience, which qualify them to make expert diagnoses, evaluations and express expert opinions. You are not required to accept any witness' classification of any particular condition as a mental disease or mental defect. You, as the triers of the facts, must decide whether the government has established beyond a reasonable doubt, as that term has been defined to you, that the defendant has no mental disease or mental defect.

If you find beyond a reasonable doubt that at the time of the act charged the defendant was not suffering from a mental disease or defect your deliberations as to the defendant's criminal responsibility is concluded. In that case he would be legally responsible for whatever act you find he has committed.

But your task will not be completed upon finding, if you do, that the defendant had a mental disease or defect or if you find that the government has failed to prove absence of mental disease or defect when the act charged was committed. The existence of a mental disease or defect, standing alone, does not excuse the defendant from criminal responsibility for his act. The defendant would still be responsible for his unlawful act if there was no causal connection between his abnormal mental condition and the act charged. Durham v. United States, 94 U.S.App.D.C. at 241, 214 F.2d at 875.

If you are satisfied beyond a reasonable doubt that the defendant committed the act charged of his own free will and with evil or vicious intent, rather than as a product of mental disease or defect, then you may find he is criminally responsible. Durham v. United States, 94 U.S.App.D.C. at 242, 214 F.2d at 876.

In reaching a determination as to whether the government has established beyond a reasonable doubt that the crime charged was not the product of a mental disease or defect you may consider and take into account the following considerations:

(a) Did the defendant understand the nature of what he was doing and were his actions due to a failure, because of mental disease or defect, properly to control his conduct? Douglas v. United States, 99 U.S.App.D.C. 232, 238, 239 F.2d 52, 58 (1956).

(b) Was the defendant a free agent, that is was he acting freely and by choice, and, confronted with a choice between doing what he knew was right and what he knew was wrong, did he choose freely to do the wrong? Carter v. United States, 102 U.S.App.D.C. 227, 235, 252 F.2d 608, 616 (1957).

(c) Was there a causal connection between the act charged and any mental disease or defect in the sense that but for this disease the act would not have been committed? Carter v. United States, 102 U.S.App.D.C. at 236, 252 F.2d at 617.

(d) Did mental disease or defect substantially disable the defendant from being able to control his conduct so as to refrain from doing the act charged? Carter v. United States, 102 U.S.App.D.C. at 235, 252 F.2d at 616.

None of these considerations is controlling but rather they are suggested as factors which you may use to guide you in reaching your determination of the ultimate issue in the case, that is whether the defendant committed the act charged of his own free will with evil or vicious intent or whether on the other hand the act was a product of mental disease or defect. Durham v. United States, 94 U.S.App.D.C. at 242, 214 F.2d at 876. In determining this question of

the relationship between the act charged and the disease the credibility and weight to be given to the testimony of any witness is for you to decide subject to the limitations I have already mentioned.

Bear in mind, at all times, that the burden is on the government to prove beyond a reasonable doubt every element of the case against the defendant.